# NEW MOTOR VEHICLE BOARD OF CALIFORNIA
## ET AL. *v.* ORRIN W. FOX CO. ET AL.

No. 77–837.   Argued October 3–4, 1978—Decided December 5, 1978*

*Together with No. 77–849, *Northern California Motor Car Dealers Assn. et al.* v. *Orrin W. Fox Co. et al.*, also on appeal from the same court.

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, MARSHALL, and REHNQUIST, JJ., joined. MARSHALL, J., filed a concurring opinion, *post*, p. 111. BLACKMUN, J., filed an opinion concurring in the result, in which POWELL, J., joined, *post*, p. 113. STEVENS, J., filed a dissenting opinion, *post*, p. 114.

*Robert L. Mukai,* Deputy Attorney General of California, argued the cause for appellants in No. 77–837. With him on the briefs were *Evelle J. Younger,* Attorney General, and *Stephen J. Egan,* Deputy Attorney General. *James R. McCall* argued the cause and filed briefs for appellants in No. 77–849.

*William T. Coleman, Jr.,* argued the cause for appellees in both cases. With him on the brief were *Girard E. Boudreau, Jr., George R. Baffa, Norin T. Grancell, Otis M. Smith,* and *Robert W. Culver.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Under the California Automobile Franchise Act, a motor vehicle manufacturer must secure the approval of the California New Motor Vehicle Board before opening a retail motor vehicle dealership within the market area of an existing franchisee, if and only if that existing franchisee protests the establishment of the competing dealership. The Act also directs the Board to notify the manufacturer of this statutory requirement upon the filing of a timely protest by an existing franchisee. The Board is not required to hold a hearing on the merits of the dealer protest before sending the manufacturer the notice of the requirement.[1]

---

[1] The pertinent provisions of the Automobile Franchise Act are as follows:

"3062. Establishing or relocating dealerships

"(a) Except as otherwise provided in subdivision (b), in the event that

A three-judge District Court for the Central District of California entered a judgment declaring that the absence of such a prior-hearing requirement denied manufacturers and

a franchisor seeks to enter into a franchise establishing an additional motor vehicle dealership within a relevant market area where the same line-make is then represented, or relocating an existing motor vehicle dealership the franchisor shall in writing first notify the Board and each franchisee in such line-make in the relevant market area of his intention to establish an additional dealership or to relocate an existing dealership within or into that market area. Within 15 days of receiving such notice or within 15 days after the end of any appeal procedure provided by the franchisor, any such franchisee may file with the board a protest to the establishing or relocating of the dealership. When such a protest is filed, the board shall inform the franchisor that a timely protest has been filed, that a hearing is required pursuant to Section 3066, and that the franchisor shall not establish or relocate the proposed dealership until the board has held a hearing as provided in Section 3066, nor thereafter, if the board has determined that there is good cause for not permitting such dealership. In the event of multiple protests, hearings may be consolidated to expedite the disposition of the issue.

"For the purposes of this section, the reopening in a relevant market area of a dealership that has not been in operation for one year or more shall be deemed the establishment of an additional motor vehicle dealership.

. . . . .

"3063. Good cause

"In determining whether good cause has been established for not entering into or relocating an additional franchise for the same line-make, the board shall take into consideration the existing circumstances, including, but not limited to:

"(1) Permanency of the investment.

"(2) Effect on the retail motor vehicle business and the consuming public in the relevant market area.

"(3) Whether it is injurious to the public welfare for an additional franchise to be established.

"(4) Whether the franchisees of the same line-make in that relevant market area are providing adequate competition and convenient consumer care for the motor vehicles of the line-make in the market area which shall include the adequacy of motor vehicle sales and service facilities, equipment, supply of vehicle parts, and qualified service personnel.

"(5) Whether the establishment of an additional franchise would in-

their proposed franchisees the procedural due process mandated by the Fourteenth Amendment, 440 F. Supp. 436 (1977). We noted probable jurisdiction of the appeals in both No. 77–837 and No. 77–849,[2] 434 U. S. 1060 (1978). We now reverse.[3]

## I

The disparity in bargaining power between automobile manufacturers and their dealers prompted Congress [4] and some

crease competition and therefore be in the public interest." Cal. Veh. Code Ann. §§ 3062, 3063 (West Supp. 1978).

[2] Appellants in No. 77–849 were made defendants in intervention by uncontested order of the District Court.

[3] On application of appellants in No. 77–837, MR. JUSTICE REHNQUIST stayed the District Court judgment, 434 U. S. 1345, (1977) (in chambers).

Appellants in No. 77–837 argue that the District Court should have abstained under the rule of *Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496 (1941), arguing that the state courts might have construed the Automobile Franchise Act so as to limit or avoid the federal constitutional question. The District Court correctly refused to abstain. Abstention may appropriately be denied where, as here, there is no ambiguity in the challenged state statute. See *Wisconsin* v. *Constantineau,* 400 U. S. 433, 439 (1971).

[4] A congressional Committee reported in 1956:

"Automobile production is one of the most highly concentrated industries in the United States, a matter of grave concern to officers of the Government charged with enforcement of the antitrust laws. Today there exist only 5 passenger-car manufacturers, 3 of which produce in excess of 95 percent of all passenger cars sold in the United States. There are approximately 40,000 franchised automobile dealers distributing to the public cars produced by these manufacturers. Dealers have an average investment of about $100,000. This vast disparity in economic power and bargaining strength has enabled the factory to determine arbitrarily the rules by which the two parties conduct their business affairs. These rules are incorporated in the sales agreement or franchise which the manufacturer has prepared for the dealer's signature.

"Dealers are with few exceptions completely dependent on the manufacturer for their supply of cars. When the dealer has invested to the extent required to secure a franchise, he becomes in a real sense the

25 States to enact legislation to protect retail car dealers from perceived abusive and oppressive acts by the manufacturers.[5] California's version is its Automobile Franchise Act.[6]   Among

economic captive of his manufacturer.   The substantial investment of his own personal funds by the dealer in the business, the inability to convert easily the facilities to other uses, the dependence upon a single manufacturer for supply of automobiles, and the difficulty of obtaining a franchise from another manufacturer all contribute toward making the dealer an easy prey for domination by the factory.   On the other hand, from the standpoint of the automobile manufacturer, any single dealer is expendable.   The faults of the factory-dealer system are directly attributable to the superior market position of the manufacturer."   S. Rep. No. 2073, 84th Cong., 2d Sess., 2 (1956).   See also S. Macaulay, Law and the Balance of Power: The Automobile Manufacturers and Their Dealers (1966).

[5] See Automobile Dealers' Day in Court Act, 15 U. S. C. §§ 1221–1225; Ariz. Rev. Stat. Ann. § 28–1304.02 (1976); Cal. Veh. Code Ann. § 3060 et seq. (West Supp. 1978); Colo. Rev. Stat. § 12–6–120 (1973); Fla. Stat. § 320.641 (1977); Ga. Code § 84–6610 (f) (Supp. 1977); Haw. Rev. Stat. § 437–33 (1976); Idaho Code § 49–1901 et seq. (1967); Iowa Code § 322A.2 (1977); Md. Transp. Code Ann. § 15–207 (1977); Mass. Gen. Laws Ann., ch. 93B, § 4 (3) (West Supp. 1978–1979); Neb. Rev. Stat. § 60–1422 (1974); N. H. Rev. Stat. Ann. § 357–B:4 III (c) (Supp. 1977); N. M. Stat. Ann. § 64–37–5 (Supp. 1975); N. C. Gen. Stat. § 20–305 (5) (1978); N. D. Cent. Code § 51–07–01.1 (Supp. 1977); Ohio Rev. Code Ann. § 4517.41 (Supp. 1977); Okla. Stat., Tit. 47, § 565 (j) (Supp. 1978); Pa. Stat. Ann., Tit. 63, § 805 (Purdon Supp. 1978–1979); R. I. Gen. Laws § 31–5.1–4 (Supp. 1977); S. C. Code § 56–15–40 (3)(c) (1977); S. D. Comp. Laws Ann. § 32–6A–5 (1976); Tenn. Code Ann. § 59–1714 (c) (Supp. 1978); Vt. Stat. Ann., Tit. 9, § 4074 (Supp. 1977–1978); Va. Code § 46.1–547 (Supp. 1978); W. Va. Code § 47–17–5 (Supp. 1978); Wis. Stat. Ann. § 218.01 (1957 and Supp. 1978–1979).

[6] California first adopted special regulations applicable to dealers and manufacturers of automobiles in 1923.   1923 Cal. Stats., ch. 266, §§ 46 (a), (b).   These required dealers and manufacturers to apply for certification and special identifying license plates as a condition of exemption from generally applicable registration requirements.   In 1957 the former certification procedure became a licensing provision, and all automobile dealers were required to apply for licenses to qualify for and continue to hold the registration exemption.   1957 Cal. Stats., ch. 1319, § 7.   In

its other safeguards, the Act protects the equities of existing dealers by prohibiting automobile manufacturers from adding dealerships to the market areas of its existing franchisees where the effect of such intrabrand competition would be injurious to the existing franchisees and to the public interest.[7]

addition, it became unlawful on and after October 1, 1957, to act as a dealer without having procured a license. *Ibid.* The prohibition on unlicensed activity was extended to manufacturers and motor vehicle transporters by 1967 Cal. Stats., ch. 557, § 1. That statute made it unlawful for any person to act as a dealer, manufacturer, or transporter of motor vehicles without a valid license and certificate issued by the Department of Motor Vehicles. § 2. The 1967 statute also created the New Motor Vehicle Board, originally empowered to handle licensing of new automobile retail dealerships and to review decisions of the Department of Motor Vehicles disciplining dealers. Its powers were expanded in 1973 by the Automobile Franchise Act to empower the Board to deal with the establishment of new franchises and the relocation of existing franchises. The California Legislature expressly stated that this Act was passed "in order to avoid undue control of the independent new motor vehicle dealer by the vehicle manufacturer or distributor and to insure that dealers fulfill their obligations under their franchises and provide adequate and sufficient service to consumers generally." 1973 Cal. Stats., ch. 996, § 1. The Act also sets forth rules and procedures governing franchise cancellations, delivery and preparation obligations and warranty reimbursement. See Cal. Veh. Code Ann. §§ 3060, 3061, 3064, and 3065 (West Supp. 1978).

[7] For a helpful discussion of the purpose served by such laws—the promotion of fair dealing and the protection of small business—see *Forest Home Dodge, Inc.* v. *Karns,* 29 Wis. 2d 78, 138 N. W. 2d 214 (1965). This concern has prompted at least 18 other States to enact statutes which, like the Automobile Franchise Act, prescribe conditions under which new or additional dealerships may be permitted in the territory of the existing dealership. See Ariz. Rev. Stat. Ann. § 28–1304.02 (1976); Colo. Rev. Stat. § 12–6–120 (1973); Fla. Stat. § 320.642 (1977); Ga. Code §§ 84–6610 (f)(8), (10) (Supp. 1977); Haw. Rev. Stat. §§ 437–28 (a), (b)(22) (1976); Iowa Code § 322A.4 (1977); Mass. Gen. Laws Ann., ch. 93B, § 4 (3)(e)(1) (West Supp. 1978–1979); Neb. Rev. Stat. § 60–1422 (1974); N. H. Rev. Stat. Ann. § 357–B:4 III (c) (Supp. 1977); N. M. Stat. Ann. § 64–37–5 (Supp. 1975); N. C. Gen. Stat. § 20–305 (5) (1978); R. I. Gen. Laws § 31–5.1–4 (C)(11) (Supp. 1977); S. D. Comp. Laws

To enforce this prohibition, the Act requires an automobile manufacturer who proposes to establish a new retail automobile dealership in the State, or to relocate an existing one, first to give notice of such intention to the California New Motor Vehicle Board and to each of its existing franchisees in the same "line-make" of automobile located within the "relevant market area," defined as "any area within a radius of 10 miles from the site of [the] potential new dealership." [8] If any existing franchisee within the market area protests to the Board within 15 days, the Board is required to convene a hearing within 60 days to determine whether there is good cause for refusing to permit the establishment or relocation of the dealership.[9] The Board is also required to inform the franchisor, upon the filing of a timely protest,

> "that a timely protest has been filed, that a hearing is required . . . , and that the franchisor shall not establish or relocate the proposed dealership until the board has held a hearing . . . , nor thereafter, if the board has determined that there is good cause. for not permitting such dealership." [10]

Violation of the statutory requirements by a franchisor is a misdemeanor and ground for suspension or revocation of a license to do business.[11]

---

Ann. §§ 32–6A–3 to 32–6A–4 (1976); Tenn. Code Ann. § 59–1714 (Supp. 1978); Vt. Stat. Ann., Tit. 9, § 4074 (c)(9) (Supp. 1977–1978); Va. Code § 46.1–547 (d) (Supp. 1978); W. Va. Code § 47–17–5 (i) (Supp. 1978); Wis. Stat. Ann. §§ 218.01 (3), (8) (1957 and Supp. 1978–1979).

[8] See Cal. Veh. Code Ann. § 507 (West Supp. 1978).

[9] Within 30 days after the hearing, or of a decision of a hearing officer, the Board must render its decision, or the establishment or relocation of the proposed franchise is deemed approved. See Cal. Veh. Code Ann. § 3067 (West Supp. 1978).

[10] See n. 1, *supra*.

[11] California Veh. Code Ann. § 11713.2 (West Supp. 1978) provides:

"It shall be unlawful and a violation of this code for any manufacturer,

Appellee General Motors Corp. manufactures, among other makes, Buick and Chevrolet cars. Appellee Orrin W. Fox Co. signed a franchise agreement with appellee General Motors in May 1975 to establish a new Buick dealership in Pasadena. Appellee Muller Chevrolet agreed with appellee General Motors to transfer its existing Chevrolet franchise from Glendale to La Canada, Cal., in December 1975. The proposed establishment of Fox and relocation of Muller were protested respectively by existing Buick and Chevrolet dealers. The New Motor Vehicle Board responded, as required by the Act, by notifying appellees that the protests had been filed and that therefore they were not to establish or relocate the dealerships until the Board had held the hearings required by the Act, nor thereafter if the Board determined that there was good cause for not permitting such dealerships. Before either protest proceeded to a Board hearing, however, appellees General Motors, Fox, and Muller brought the instant action.

## II

At the outset it is important to clarify the nature of the due process challenge before us. Appellees and the dissent characterize the statute as entitling a protesting dealership to a summary administrative adjudication in the form of a notice having the effect of a temporary injunction restraining appellee General Motors' exercise of its right to franchise at will. We disagree.

The Board's notice has none of the attributes of an injunction. It creates no duty, violation of which would constitute contempt. Nor does it restrain appellee General Motors from

---

manufacturer branch, distributor, or distributor branch licensed under this code:

. . . . .

"(*l*) To modify, replace, enter into, relocate, terminate or refuse to renew a franchise in violation of Article 4 (commencing with Section 3060) of Chapter 6 of Division 2."

exercising any right that it had previously enjoyed; General Motors had no interest in franchising that was immune from state regulation. It was the Act, not the Board's notice, that curtailed General Motors' right to franchise at will. The California Vehicle Code explicitly conditions a motor vehicle manufacturer's right to terminate, open, or relocate a dealership upon the manufacturer's compliance with the procedural requirements enacted in the Automobile Franchise Act and, if necessary, upon the approval of the New Motor Vehicle Board.[12] The Board's notice served only to inform appellee General Motors of this statutory scheme and to advise it of the status, pending the Board's determination, of its franchise permit applications.

Moreover, the Board's notice can hardly be characterized as an administrative order. Issuance of the notice did not involve the exercise of discretion. The notice neither found nor assumed the existence of any adjudicative facts. The notice did not terminate or suspend any right or interest that General Motors was then enjoying. The notice did not deprive General Motors of any personal property, or terminate any of the incidents of its license to do business.

---

[12] The California Legislature expressly identified the state interests being served by the Franchise Act as "the general economy of the state and the public welfare . . ." which made it "necessary to regulate and to license vehicle dealers [and] manufacturers . . . ." The statute states:

"[T]he distribution and sale of new motor vehicles in the State of California vitally affects the general economy of the state and the public welfare and . . . in order to promote the public welfare and in the exercise of its police power, it is necessary to regulate and to license vehicle dealers, manufacturers, manufacturer branches, distributors, distributor branches, and representatives of vehicle manufacturers and distributors doing business in California in order to avoid undue control of the independent new motor vehicle dealer by the vehicle manufacturer or distributor and to insure that dealers fulfill their obligations under their franchises and provide adequate and sufficient service to consumers generally." 1973 Cal. Stats., ch. 996, § 1.

Thus, this is not a case like *Fuentes* v. *Shevin,* 407 U. S. 67 (1972), and *Bell* v. *Burson,* 402 U. S. 535 (1971), relied upon by appellees, in which a state official summarily finds or assumes the existence of certain adjudicative facts and based thereon suspends the enjoyment of an entitlement. There has not yet been either the determination of adjudicative facts, the exercise of discretion, or a suspension.

Notwithstanding all this, appellees argue that the state scheme deprives them of their liberty to pursue their lawful occupation without due process of law. Appellees contend that absent a prior individualized trial-type hearing they are constitutionally entitled to establish or relocate franchises while their applications for approval of such proposals are awaiting Board determination. Appellees' argument rests on the assumption that General Motors has a due process protected interest right to franchise at will—which asserted right survived the passage of the California Automobile Franchise Act.

The narrow question before us, then, is whether California may, by rule or statute, temporarily delay the establishment or relocation of automobile dealerships pending the Board's adjudication of the protests of existing dealers. Or stated conversely, the issue is whether, as the District Court held and the dissent argues, the right to franchise without delay is the sort of interest that may be suspended only on a case-by-case basis through prior individualized trial-type hearings.

We disagree with the District Court and the dissent. Even if the right to franchise had constituted a protected interest when California enacted the Automobile Franchise Act, California's Legislature was still constitutionally empowered to enact a general scheme of business regulation that imposed reasonable restrictions upon the exercise of the right. "[T]he fact that a liberty cannot be inhibited without due process of law does not mean that it can under no circumstances be inhibited." *Zemel* v. *Rusk,* 381 U. S. 1, 14 (1965). At least since

the demise of the concept of "substantive due process" in the area of economic regulation, this Court has recognized that, "[l]egislative bodies have broad scope to experiment with economic problems . . . ." *Ferguson* v. *Skrupa*, 372 U. S. 726, 730 (1963). States may, through general ordinances, restrict the commercial use of property, see *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 (1926), and the geographical location of commercial enterprises, see *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 491 (1955). Moreover, "[c]ertain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned. . . . [S]tatutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms if they do enter into agreements, are within the state's competency." *Nebbia* v. *New York*, 291 U. S. 502, 528 (1934).

In particular, the California Legislature was empowered to subordinate the franchise rights of automobile manufacturers to the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices. "[S]tates have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law. . . . [T]he due process clause is [not] to be so broadly construed that the Congress and state legislatures are put in a straitjacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare." *Lincoln Union* v. *Northwestern Co.*, 335 U. S. 525, 536–537 (1949). See also *North Dakota Board of Pharmacy* v. *Snyder's Drug Stores, Inc.*, 414 U. S. 156 (1973); *Ferguson* v. *Skrupa, supra; Williamson* v. *Lee Optical Co., supra.*

Further, the California Legislature had the authority to protect the conflicting rights ·of the motor vehicle franchisees through customary and reasonable procedural safeguards, *i. e.*, by providing existing dealers with notice and an opportunity

to be heard by an impartial tribunal—the New Motor Vehicle Board—before their franchisor is permitted to inflict upon them grievous loss. Such procedural safeguards cannot be said to deprive the franchisor of due process. States may, as California has done here, require businesses to secure regulatory approval *before* engaging in specified practices. See, *e. g., North Dakota Board of Pharmacy* v. *Snyder's Drug Stores, supra* (pharmacy-operating permit); *St. Louis Poster Adv. Co.* v. *St. Louis,* 249 U. S. 269 (1919) (billboard permits); *Hall* v. *Geiger-Jones Co.,* 242 U. S. 539 (1917) (securities registration); *Adams* v. *Milwaukee,* 228 U. S. 572 (1913) (milk inspection); *Gundling* v. *Chicago,* 177 U. S. 183 (1900) (cigarette sales license).

These precedents compel the conclusion that the District Court erred in holding that the California Legislature was powerless temporarily to delay appellees' exercise of the right to grant or undertake a Buick or Chevrolet dealership and the right to move one's business facilities from one location to another without providing a prior individualized trial-type hearing. Once having enacted a reasonable general scheme of business regulation, California was not required to provide for a prior individualized hearing each and every time the provisions of the Act had the effect of delaying consummation of the business plans of particular individuals. In the area of business regulation "[g]eneral statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." *Bi-Metallic Investment Co.* v. *Colorado,* 239 U. S. 441, 445 (1915).

III

Appellees and the dissent argue that the California scheme constitutes an impermissible delegation of state power to

private citizens because the Franchise Act requires the Board to delay franchise establishments and relocations only when protested by existing franchisees who have unfettered discretion whether or not to protest.

The argument has no merit. Almost any system of private or quasi-private law could be subject to the same objection. Court approval of an eviction, for example, becomes necessary only when the tenant protests his eviction, and he alone decides whether he will protest. An otherwise valid regulation is not rendered invalid simply because those whom the regulation is designed to safeguard may elect to forgo its protection. See *Cusack Co.* v. *Chicago,* 242 U. S. 526 (1917).

## IV

Appellees next contend that the Automobile Franchise Act conflicts with the Sherman Act, 15 U. S. C. § 1 *et seq.*[18] They argue that by delaying the establishment of automobile dealerships whenever competing dealers protest, the state scheme gives effect to privately initiated restraints on trade, and thus is invalid under *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384 (1951).

The dispositive answer is that the Automobile Franchise Act's regulatory scheme is a system of regulation, clearly articulated and affirmatively expressed, designed to displace unfettered business freedom in the matter of the establishment and relocation of automobile dealerships. The regulation is therefore outside the reach of the antitrust laws under the "state action" exemption. *Parker* v. *Brown,* 317 U. S. 341 (1943); *Bates* v. *State Bar of Arizona,* 433 U. S. 350 (1977). See also *City of Lafayette* v. *Louisiana Power & Light Co.,* 435 U. S. 389 (1978).

---

[18] The District Court did not pass upon this contention. We choose to address it because the underlying facts are undisputed and the question presented is purely one of law.

The Act does not lose this exemption simply because, as part of its regulatory framework, it accords existing dealers notice and an opportunity to be heard before their franchisor is permitted to locate a dealership likely to subject them to injurious and possibly illegal competition. Protests serve only to trigger Board action.[14] They do not mandate significant delay. On the contrary, the Board has the authority to order an immediate hearing on a dealer protest if it concludes that the public interest so requires. The duration of interim restraint is subject to ongoing regulatory supervision.

Appellees' reliance upon *Schwegmann Bros.* v. *Calvert Distillers Corp., supra,* is misplaced. In *Schwegmann,* the State attempted to authorize and immunize private conduct violative of the antitrust laws. California has not done that here. Protesting dealers who invoke in good faith their statutory right to governmental action in the form of a Board determination that there is good cause for not permitting a proposed dealership do not violate the Sherman Act, *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.,* 365 U. S. 127 (1961), and *Mine Workers* v. *Pennington,* 381 U. S. 657, 670 (1965)[15]

Appellees also argue conflict with the Sherman Act because the Automobile Franchise Act permits auto dealers to invoke state power for the purpose of restraining intrabrand competition. "This is merely another way of stating that the . . .

---

[14] Appellees state, without challenge by appellants: "117 protests have been filed under § 3062 since the Act became effective (July 1, 1974). Of these, only 42 have gone to a hearing on the merits, and only one has been sustained by the Board . . . . Thus, of 117 automatic temporary injunctions issued by the Board, only one ever matured into a permanent injunction." Brief for Appellees 10 n. 13.

[15] Dealers who press sham protests before the New Motor Vehicle Board for the sole purpose of delaying the establishment of competing dealerships may be vulnerable to suits under the federal antitrust laws. See *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508 (1972).

statute will have an anticompetitive effect. In this sense, there is a conflict between the statute and the central policy of the Sherman Act—'our charter of economic liberty.' . . . Nevertheless, this sort of conflict cannot itself constitute a sufficient reason for invalidating the . . . statute. For if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed." *Exxon Corp.* v. *Governor of Maryland,* 437 U. S. 117, 133 (1978).

*Reversed.*

MR. JUSTICE MARSHALL, concurring.

Although I join the opinion of the Court, I write separately to emphasize why, in my view, the California Automobile Franchise Act is not violative of the Due Process Clause. As the Court observes, *ante,* at 100–103, the California statute, like its state and federal counterparts, seeks to redress the disparity in economic power between automobile manufacturers and their franchisees. By empowering the New Motor Vehicle Board to superintend the establishment or relocation of a franchise, the statute makes it more difficult for a manufacturer to force its franchisees to accept unfair conditions of trade by threatening to overload their markets with intrabrand competitors.[1]

---

[1] Although there is little legislative history on the California Act, the need for statutory constraints on manufacturers' ability to coerce their dealers is reflected in a variety of state and federal enactments. See, *e. g.,* statutes cited *ante,* at 101 n. 5; H. R. Rep. No. 2850, 84th Cong., 2d Sess., 4–5 (1956); S. Rep. No. 2073, 84th Cong., 2d Sess., 2–4 (1956); *Forest Home Dodge, Inc.* v. *Karns,* 29 Wis. 2d 78, 138 N. W. 2d 214 (1965). See generally S. Macaulay, Law and the Balance of Power: The Automobile Manufacturers and Their Dealers 139 (1966).

The dissenting opinion, *post,* at 121, suggests that the right of existing franchisees to protest the entry of a new competitor is of "little value," since less than 1% of the protests were successful and two-thirds were

This litigation arises because of the delay necessarily incident to the Board's inquiry. Given the unavoidable time lag between the filing of protests and the Board's hearing, the State had to elect whether to permit the establishment or relocation of dealerships pending the Board's determination of their legality. To enjoin temporarily the proposed transactions would deprive new dealers and their franchisors of legitimate profits in cases where the dealership was eventually approved. On the other hand, allowing the transactions to go forward would force existing franchisees to bear the burden of illegal competition in cases where the Board ultimately disapproved the new dealership. Perhaps because the policy of redressing the economic imbalance between franchisees and manufacturers would be thwarted if existing franchisees were left unprotected until the Board made its decision, the California Legislature chose the former option.[2]

Assuming appellees' interest in immediately opening or relocating a franchise implicates the Due Process Clause, I do not believe it outweighs the interest of the State in protecting existing franchisees from unfair competition and economic coercion pending completion of the Board's inquiry. See *Goldberg* v. *Kelly,* 397 U. S. 254, 262–263 (1970); *Board of Regents* v. *Roth,* 408 U. S. 564, 570–571 (1972). The state legislature has decided to impose the burdens of delay on appellees rather than on existing franchisees. In view of the substantial public interest at stake and the short lapse of

---

abandoned in advance of any hearing. These figures, however, may indicate merely that the California statute has successfully served a deterrent function. In any event, the California Legislature could legitimately conclude that the "right to be heard does not depend upon an advance showing that one will surely prevail at the hearing." *Fuentes* v. *Shevin,* 407 U. S. 67, 87 (1972).

[2] See n. 1, *supra.* The State may also have sought to protect aspiring franchisees from the economic loss they would incur if the Board disapproved their applications after they had commenced operations.

time between notice and hearing, the Due Process Clause does not dictate a contrary legislative decision.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE POWELL joins, concurring in the result.

I agree with the Court when it concludes (a) that the District Court rightly refused to abstain under the rule of *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496 (1941); (b) that the appellees' delegation-of-power argument is unmeritorious; and (c) that the appellees' antitrust claims are also without merit.

We are concerned here, basically, only with the issue of the facial constitutionality of certain provisions of the California Automobile Franchise Act, Cal. Veh. Code Ann. §§ 3062, 3063 (West Supp. 1978); we are not confronted with any issue of constitutionality of the Act as applied.

It seems to me that we should recognize forthrightly the fact that California, under its Act, accords the manufacturer and the would-be franchisee *no* process at all prior to telling them not to franchise at will. This utter absence of process would indicate that the State's action is free from attack on procedural due process grounds only if the manufacturer and the franchisee possess no liberty or property interest protected under the Fourteenth Amendment. Indeed, that is the way I would analyze the case.

*Meyer* v. *Nebraska*, 262 U. S. 390, 399 (1923), of course, defined "liberty" to include "the right . . . to engage in any of the common occupations of life." The California statute, however, does not deprive anyone of any realistic freedom to become an automobile dealer or to grant a franchise; it simply regulates the location of franchises to sell certain makes of cars in certain geographical areas. The absence of regulation by California prior to the Act's adoption in 1973 surely in itself created no liberty interest susceptible of later deprivation. And the abstract expectation of a new franchise does not qualify as a property interest.

I regard this litigation as not focusing on procedural due process at all. Instead, it centers essentially on a claim of substantive due process. Appellees have conceded that California may legitimately regulate automobile franchises and that the State may legitimately provide a hearing as part of its regulatory scheme. The only issue, then, is whether California may declare that the status quo is to be maintained *pending a hearing.* In my view, California's declaration to this effect is no more than a necessary incident of its power to regulate at all. Maintenance of the status quo pending final agency action is common in many regulatory contexts. The situation here, for example, is not dissimilar to the widely adopted routine of withholding the effectiveness of announced increases in utility rates until specified conditions have been fulfilled. In asserting a right to franchise at will and a right to franchise without delay, appellees are essentially asserting a right to be free from state economic regulation. But any claim the appellees may have to be free from state economic regulation is foreclosed by the substantive due process cases, such as *Ferguson* v. *Skrupa,* 372 U. S. 726 (1963), which the Court cites.

To summarize: For me, the appellees have demonstrated the presence of no liberty or property interest; having none, they have no claim to procedural safeguards; and their claim to be free from state economic regulation is foreclosed by the substantive due process cases. Perhaps this is what the Court is saying in its opinion. I am, however, somewhat unsure of that. I prefer to recognize the facts head on; when one does, the answer, it seems to me, is inevitable and immediately forthcoming.

MR. JUSTICE STEVENS, dissenting.

This case does not involve the constitutionality of any of the substantive rules adopted by California to govern the operation of motor vehicle dealerships and the conditions that

must be satisfied to engage in that business. The case involves the validity of a procedure that grants private parties an exclusive right to cause harm to other private parties without even alleging that any general rule has been violated or is about to be violated.

In order to demonstrate that this is a fair characterization of this procedure, it is necessary to review the statutory scheme as a whole, to identify the purpose of the specific provision challenged in this case, and to explain the actual operation of that provision. It will then be apparent that there is no precedent for the Court's approval of this unique and arbitrary process and that the three-judge District Court was correct in concluding that it deprived appellees of their liberty and property without the due process of law guaranteed by the Fourteenth Amendment.

## I

As the Court recognizes, California's Automobile Franchise Act is a member of the family of state statutes that were enacted to protect retailers from some of the risks associated with unrestrained competition. Like the retail grocers and retail druggists who convinced so many legislatures to authorize resale price maintenance,[1] and the retail gasoline dealers who convinced the Maryland Legislature to prohibit oil company ownership of service stations,[2] the retail automobile dealers have been successful in persuading Congress and various state legislatures that unrestrained competition in the car business is not an unmixed blessing.[3] Many States have

---

[1] These efforts were also reflected in the Miller-Tydings Fair Trade Act, which was enacted by Congress in 1937 as an amendment to § 1 of the Sherman Act. 50 Stat. 693, 15 U. S. C. § 1. See generally *Schwegmann Bros.* v. *Calvert Distillers, Corp.*, 341 U. S. 384, 390–395.

[2] See *Exxon Corp.* v. *Governor of Maryland,* 437 U. S. 117 (1978).

[3] The statutes currently in force are collected in the opinion of the Court. *Ante,* at 101 n. 5. These statutes were passed essentially in three waves, the first in the late 1930's, the second in the mid-1950's, and the

enacted automobile dealer franchise statutes that regulate and limit competition in this business. Unquestionably, as the Court holds, the mere fact that statutory rules inhibit competition is not a reason for invalidating them.[4]

The general rules contained in the California Automobile Franchise Act are of two kinds. First, they establish standards that a dealer must satisfy in order to engage in the business in California. These standards are enforced through licensing regulations.[5] Because the dealer appellees in this case are properly licensed, and because they do not question the validity of any of these rules, these standards are not relevant here. Second, there are rules regulating the contractual relationships between manufacturers and their dealers, covering such matters as franchise terminations.[6] Again, these rules are not relevant because this case involves neither a termination nor any question concerning the contract between a manufacturer and an existing dealer. In sum, the substantive rules in the California statute have nothing to do with this case.

---

third in the late 1960's and early 1970's. The first two waves resulted in statutes regulating the contractual relationships between dealers and manufacturers, and were primarily designed to equalize the bargaining power of the two groups. The third wave not only extended this well-established type of statute into additional States but also resulted in the passage of provisions, such as the one involved in this case, relating to the opening of new franchises. See generally C. Hewitt, Automobile Franchise Agreements 165–167 (1955); Macaulay, Law and Society—Changing a Continuing Relationship Between a Large Corporation and those who Deal with it: Automobile Manufacturers, their Dealers, and the Legal System, 1965 Wis. L. Rev. 483, 513–521; Note, 70 Harv. L. Rev. 1239, 1243–1246 (1957); Comment, 56 Iowa L. Rev. 1060 (1971).

[4] By the same token, the legislative judgment that manufacturers have greater bargaining power than dealers and may have sometimes used it abusively by threatening to overload dealers' markets with intrabrand competitors does not provide a justification for a statutory procedure that deprives all manufacturers and all new dealers of their liberty and property without due process.

[5] Cal. Veh. Code Ann. § 11700 (West Supp. 1978).

[6] §§ 3060, 3061, 3064, and 3065 (Supp. 1978).

This case concerns only the procedure that must be followed after a licensed manufacturer and a licensed dealer have decided either to establish a new dealership or to relocate an existing dealership. The statute contains no substantive rules pertaining to the location of dealerships or the number of dealers that may operate in any given area. It includes no limitations on the manufacturer's use of the new franchise as a means of increasing its power to bargain with existing franchisees.[7] Nor does it impose any burden on the manufacturer or the new dealer to obtain a license or an approval from a public agency before the new operation may commence business.[8] It does not even authorize a public agency,

---

[7] Cf. Haw. Rev. Stat. § 437–28 (b)(22)(B) (1976); W. Va. Code § 47–17–5 (i)(2) (Supp. 1978).

[8] Cf. Fla. Stat. § 320.642 (1977); Ga. Code § 84–6610 (f)(8) (Supp. 1977); Iowa Code § 322A.4 (1977); S. D. Comp. Laws Ann. §§ 32–6A–3, 32–6A–4 (1976); Tenn. Code Ann. § 59–1714 (c)(20) (Supp. 1978); Wis. Stat. Ann. § 218.01 (3)(f) (1957).

The Court cites *Forest Home Dodge, Inc.* v. *Karns,* 29 Wis. 2d 78, 138 N. W. 2d 214 (1965), as reflective of the purposes served by statutes such as the one at issue here. *Ante,* at 102 n. 7. However, the Wisconsin statute involved in the *Forest Home* decision is considerably different from the California statute and the purposes of the former should not be uncritically imported into the latter. The Court is similarly mistaken in its characterization of the California statute as one, like Wisconsin's, that "require[s] businesses to secure regulatory approval *before* engaging in specified practices." *Ante,* at 108 (emphasis in original). As the Court itself recognizes at an earlier point, the California statute requires approval only in certain limited circumstances, *i. e.,* "if necessary" because of a competitor's protest. *Ante,* at 105. As such, the statute clearly does allow competitors to "restrain appellee[s] from exercising [a] right that [they] had previously enjoyed." *Ante,* at 104–105.

The Court also mischaracterizes the California statute when it describes it as "prohibiting automobile manufacturers from adding dealerships to the market areas of its existing franchisees where the effect of such intrabrand competition would be injurious to the existing franchisees and to the public interest." *Ante,* at 102. There is no such express prohibition in the

acting on its own motion, to conduct a hearing to determine whether the new operation is desirable or undesirable.[9]  In short, although I assume that California is entirely free to adopt a state policy against the establishment or relocation of motor vehicle franchises, no such policy is reflected in this statute.[10]

On the contrary, the statute actually embodies a presumption in favor of new locations.  That presumption, while consistent with the fact that knowledgeable businessmen do not normally make the large capital commitments associated with a new dealership unless the market will welcome the change,[11] does not rest on that economic predicate.  It rests on the language of the statute and its interpretation by the New Motor Vehicle Board.

The statute grants a curiously defined group of potential protestants—competitors within the 314-square-mile area surrounding the new location who handle the same line and make of cars—the right to demand a hearing to determine whether

California statute.  Cf. Colo. Rev. Stat. § 12–6–120 (1973); Iowa Code § 322A.4 (1977); N. M. Stat. Ann. § 64–37–5 (P) (Supp. 1975); S. D. Comp. Laws Ann. §§ 32–6A–3, 32–6A–4 (1976).

[9] Cf. Fla. Stat. § 320.642 (1977); Ga. Code § 84–6610 (f)(8) (Supp. 1977); Iowa Code § 322A.4 (1977); S. D. Comp. Laws Ann. § 32–6A–4 (1976); Tenn. Code Ann. § 59–1714 (c)(20) (Supp. 1978); Wis. Stat. Ann. § 218.01 (3)(f) (1957).

[10] The statutory statement of purpose quoted by the Court, ante, at 105 n. 12, includes no reference to a policy against new or relocated dealerships.  By comparison, such statutes as Fla. Stat. § 320.642 (1977); Ga. Code § 84–6610 (f)(8) (Supp. 1977); Tenn. Code Ann. § 59–1714 (c)(20) (Supp. 1978); and Wis. Stat. Ann. § 218.01 (3)(f) (1957), authorize public officials to deny applications for approval of new dealerships in all cases where existing dealers in the area are providing "adequate representation" of the relevant line and make of cars.

[11] B. Pashigian, The Distribution of Automobiles, An Economic Analysis of the Franchise System 151 (1961); Comment, supra n. 3, at 1065–1067.

"there is good cause for not permitting such dealership." [12] This language is repeated in two separate sections of the California statute.[13] Notably, the statute does not place the burden of establishing that there is good cause to permit the dealership to go forward on the new dealer or the manufacturer;[14] it places the burden of demonstrating that there is good cause *not* to permit the new opening to take place on the

---

[12] California Veh. Code Ann. § 3062 (West Supp. 1978) provides, in part:

"When such a protest is filed, the board shall inform the franchisor that a timely protest has been filed, that a hearing is required pursuant to Section 3066, and that the franchisor shall not establish or relocate the proposed dealership until the board has held a hearing as provided in Section 3066, nor thereafter, *if the board has determined that there is good cause for not permitting such dealership.*" (Emphasis added.)

Section 507 defines the 314-square-mile area that encompasses competitors with standing to challenge new dealerships.

[13] In addition to the portion of § 3062 quoted in n. 12, *supra,* § 3063 provides:

"*In determining whether good cause has been established for not entering into or relocating an additional franchise for the same line-make,* the board shall take into consideration the existing circumstances, including, but not limited to:

"(1) Permanency of the investment.

"(2) Effect on the retail motor vehicle business and the consuming public in the relevant market area.

"(3) Whether it is injurious to the public welfare for an additional franchise to be established.

"(4) Whether the franchisees of the same line-make in that relevant market area are providing adequate competition and convenient consumer care for the motor vehicles of the line-make in the market area which shall include the adequacy of motor vehicle sales and service facilities, equipment, supply of vehicle parts, and qualified service personnel.

"(5) Whether the establishment of an additional franchise *would increase competition and therefore be in the public interest.*" (Emphasis added.)

[14] Cf. Iowa Code § 322A.4 (1977); S. D. Comp. Laws Ann. §§ 32–6A–3, 32–6A–4 (1976). See generally Comment, *supra* n. 3, at 1062–1063.

objecting dealer.[15]  If the scales are evenly balanced, the presumption will prevail.

The California Board's actual administration of the statute confirms this analysis.  Of the first 117 protests filed under the law, only 1 was sustained by the Board.[16]  In other words, over 99% of the contested new dealerships or relocations were found to be consistent with the policy of the statute.

The conclusion that there is no state policy against new dealerships is further confirmed by the statutory limitation on the persons who have standing to object to a proposed new opening.  Most significantly, no public agency has any independent right to initiate an objection, to schedule a hearing, or to prohibit such a change.[17]  Nor does any member of the consuming public have standing to complain.[18]  Indeed, even neighboring dealers who might be severely affected by new competition are without standing unless they handle the same line of cars as the new dealer.  Finally, if a manufacturer is able—by whatever means—to persuade its dealers in the relevant area not to protest, the statutory policy will have been wholly vindicated without any action on the part of responsible state·officials.

Properly analyzed, the statute merely confers a special benefit on a limited group of private persons who are likely to oppose the establishment or relocation of a new car dealership.  Because those persons may suffer economic injury as a consequence of new competition, they are given two quite different rights.  One is relatively meaningless, the other is

---

[15] Cal. Veh. Code Ann. § 3066 (b) (West Supp. 1978) ("The [existing] franchisee shall have the burden of proof to establish there is good cause not to enter into a franchise establishing or relocating an additional motor vehicle dealership").

[16] See ante, at 110 n. 14; Brief for Appellees 10 n. 13.

[17] Cf. statutes cited in n. 10, supra.

[18] Cf. Iowa Code § 322A.7 (1977).

significant.  The first is an administrative right of action to try to persuade the Board that there is good cause for not permitting the new competitor to enter the market.  It is obvious that this right is of little value, since less than 1% of the protests are successful.  Indeed, since about two-thirds of the protests were abandoned in advance of any hearing,[19] it is fair to infer that an opportunity to prevail at the hearing itself is not the primary object of the protest.

The second right that the statute gives to a complaining dealer is the unqualified entitlement to an order that is tantamount to a preliminary injunction absolutely prohibiting the opening of the new dealership until after the relatively meaningless hearing has been completed.[20]  The "injunction" issues without any showing of probable success on the merits, without any proof of irreparable harm, and without provision for a bond or other compensation to indemnify the new dealer against loss caused by the delay.  The entirely uninformative words "I protest" are enough to entitle one private party to obtain an order restraining the activities of a potential competitor.[21]  Violation of that order subjects the manufac-

[19] See Brief for Appellees 10 n. 13.

[20] Cal. Veh. Code Ann. §§ 3062, 3066 (West Supp. 1978).

[21] California's statutory scheme may be contrasted with another approach that also affords existing dealers a cause of action to block new dealerships, but does so with considerably more process.  Under N. M. Stat. Ann. § 64-37-5 (P) (Supp. 1975), it is unlawful for a manufacturer to establish an additional franchise in a community where the same line-make is currently represented "if such addition would be inequitable to the existing dealer."  The statute makes "the sales and service needs of the public" relevant "in determining the equities of the existing dealer." Existing dealers are given a private cause of action in state courts to enforce this prohibition and are expressly afforded the right to seek either an injunction, damages, or both.  §§ 64-37-11, 64-37-13 (Supp. 1975). It is apparent from the statute that the normal incidents of civil practice— for example, the requirement of an adequate complaint, and judicial consideration of the merits before any relief is afforded—apply in these authorized suits.  See also Colo. Rev. Stat. §§ 12-6-120 (1)(h), 12-6-122

turer and franchisee to criminal penalties and revocation of their licenses.[22]

In sum, new franchisees and their franchisors are not merely identified by the statute as in essence a new class of parties defendant in a new class of lawsuits designed in extremely rare instances to block the franchise; rather, without assuring these "defendants" that they will receive notice of the claims against them, a probable-cause finding, or a hearing of any kind,[23] the statute subjects them to an immediate injunction against the pursuit of their right to establish or relocate a car dealership upon the filing of a protest by a competitor-"plaintiff." [24]

The duration of the injunctive relief is not precisely defined by the statute,[25] but the facts of these cases demonstrate that

---

(3) (1973); Mass. Gen. Laws Ann., ch. 93B, § 4 (3) (l) (West. Supp. 1978–1979).

[22] Cal. Veh. Code Ann. §§ 11705 (a) (3), 11705 (a) (10), 11713.2 (l), 40000.11 (West. Supp. 1978).

[23] In addition, the statute gives the "defendants" the burden in every case of informing the "plaintiffs" when their cause of action arises.

[24] Put in the more traditional language of due process analysis, the California scheme recognizes a right on the part of manufacturers and prospective dealers to establish or relocate automobile dealerships. It allows the State permanently to deprive those persons of that right upon a hearing and demonstration of cause. Finally, and what is at issue here, it allows private persons to invoke the power of the State to deprive manufacturers and prospective dealers of their rights temporarily without any process at all.

[25] Once a protest is filed, and an injunction has automatically been granted, Cal. Veh. Code Ann. § 3066 (a) (West. Supp. 1978) requires the Board to set a hearing. Although the hearing must be held within 60 days under that provision, this time limit is usually avoided when the Board refers the protest to a hearing officer, upon whom no statutory time limit is imposed. Moreover, after the hearing officer reaches a decision, the Board may either take another 30 days in adopting that decision, or an indefinite period of time in reaching an independent decision. The Board may also refer the decision back to the hearing officer with directions to take additional evidence and reach a new decision.

the relief may last for many months.[26]  In a dynamic, competitive business such delays may entirely frustrate the plans for the new dealership—as happened in one of these cases—

[26] "The manner in which the passage of the Act and the administration thereof have affected the present plaintiffs is revealed in the uncontradicted affidavits and documentary exhibits submitted by the parties.  The only Buick dealer in Pasadena terminated his franchise early in 1974, and a replacement dealer had not been established until May 1975, when plaintiffs General Motors and Orrin W. Fox Co. executed a franchise agreement.  Protests promptly were filed by Buick dealers located in the nearby cities of Monrovia and San Gabriel on about May 22, 1975.  On May 29, 1975, the Board sent letters to General Motors advising of the protests and stating that 'you may not . . . establish the proposed dealership until the Board has held a hearing as provided for in Section 3066 Vehicle Code, nor thereafter if the Board has determined that there is good cause for not permitting such additional dealership.'  The letter also advised that the Board would later fix a time for the hearing and would advise accordingly.  On July 8, 1975, the Board assigned the dates of August 11 and 12, 1975, for the hearing.

"However, as the result of requests for continuance by the protesters and by stipulation, and protracted litigation in the courts concerning the right to take prehearing depositions, the protests were reset for hearing on September 15, 1976.  They therefore were still pending when the present action was filed, on April 13, 1976.

"The foregoing recital shows that, under the provisions of the Act, the protesters were able to prevent plaintiff Fox from being established as a potential (although geographically rather remote) competitor for more than fifteen months (including the entire 1976 Buick model year), without any official consideration being given to the merit or lack of merit of the protests.  Fox understandably assesses at many thousands of dollars its damages occasioned by such delay.

"Plaintiff Muller Chevrolet took over an existing dealership in the Montrose section of Glendale in 1973.  It soon became apparent to Muller that its physical facilities were completely inadequate and rapidly deteriorating and that a move to a new and much larger location was mandatory.  In December 1974, Mr. Muller learned that the location of the current Volkswagen dealership in the adjacent community of La Canada might become available.  Negotiations were begun that were contingent upon the Volkswagen dealer finding a new site for his operation, and upon the ability of the parties to finance their respective moves.

or at least cause the new dealer to lose the opportunity to participate in a favorable market for new models. That the statutory deprivation is a temporary delay rather than a permanent denial does not avoid the serious character of the harm suffered by the new dealer while the status quo is being preserved.[27]

## II

Apart from some substantive due process cases which have nothing to do with the procedural question presented by this

---

After a year of complex and time-consuming negotiations, an agreement was reached in December 1975 and the required notice of intention to relocate was served upon the Board and the surrounding Chevrolet dealers on about January 16, 1976. A few days later, Chevrolet dealers in Pasadena and Tujunga, respectively, filed with the Board letters saying, in effect, no more than 'I protest,' and on February 6, 1976, the Board responded by enjoining the proposed relocation pending a hearing on the protests. About two weeks later, on February 23, 1976, the Board 'tentatively' set the hearing for June 23 through 25, 1976, and on April 21, 1976, issued a formal order confirming those dates. It is worthy of note here that such hearing was scheduled for a time more than four months after the injunction had been issued.

"It appears from a supplemental affidavit filed by Mr. Muller on September 17, 1976, that the scheduled hearing took place before a hearing officer and that the latter rendered a decision favorable to the proposed relocation on about August 20, 1976. Then began the thirty-day waiting period within which time the Board might act upon that decision before the proposed relocation could be deemed approved and the injunction finally lifted (Vehicle Code § 3067). On September 14, 1976, before the end of such waiting period, Muller was advised that the new leasehold premises were no longer available for his dealership because of his long failure to take possession and otherwise assume the obligations of the lease. Muller thereupon 'gave up' with respect to this litigation and is starting all over again in his attempt to find a new site for his business." 440 F. Supp. 436, 439–440 (CD Cal. 1977) (three-judge court).

[27] *Fuentes* v. *Shevin*, 407 U. S. 67, 84–85 ("[I]t is now well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment").

case [28] the Court cites no authority for its novel interpretation of the Fourteenth Amendment. This is hardly surprising because this summary procedure for resolving conflicts between private parties flagrantly violates the precepts embodied in the Court's prior cases.

Whenever one private party seeks relief against another, it is fundamental that some attention to the merits of the request must precede the granting of relief. *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 313. The challenged statute provides for no such consideration of the merits nor even any notice to the losing party of what the merits of the claim against him involve.[29]

It is equally fundamental that the State's power to deprive any person of liberty or property may not be exercised except at the behest of an official decisionmaker. In a somewhat different context, the Court correctly observed:

"[I]n the very nature of things, one [private] person may not be entrusted with the power to regulate the business of another, and especially of a competitor. And a statute

---

[28] See, *e. g., Ferguson* v. *Skrupa*, 372 U. S. 726; *Lincoln Union* v. *Northwestern Co.*, 335 U. S. 525, 536–537; *North Dakota Board of Pharmacy* v. *Snyder's Drug Stores, Inc.*, 414 U. S. 156; *Williamson* v. *Lee Optical Co.*, 348 U. S. 483.

Although the Court has distinguished between economic and other rights in giving scope to the substantive requirements of the Due Process Clause, *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152–153, n. 4, it has carefully and explicitly avoided that distinction in applying the procedural requirements of the Clause. *E. g., North Georgia Finishing, Inc.* v. *Di-Chem, Inc.*, 419 U. S. 601, 608; *Fuentes* v. *Shevin, supra,* at 89–90. Accordingly, I assume that, despite its curious citation of the cases that establish a low level of substantive protection for economic rights, the Court is not implying that those rights do not merit the procedural protection afforded by the Fourteenth Amendment.

[29] Although the Court has endorsed the modern relaxation of pleading rules, it has never receded from the requirement that civil complaints provide parties defendant with "fair notice" of the claims against them. *Conley* v. *Gibson*, 355 U. S. 41, 48.

which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property." *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 311.

More recently, the Court has applied these principles in procedural due process contexts similar to the one at issue here. For example, in *Fuentes* v. *Shevin*, 407 U. S. 67, 93, the Court had this to say in invalidating a statute that enabled private parties unconditionally to exercise the State's power:

"The statutes, moreover, abdicate effective state control over state power. Private parties, serving their own private advantage, may unilaterally invoke state power to replevy goods from another. No state official participates in the decision to seek a writ; no state official reviews the basis for the claim to repossession; and no state official evaluates the need for immediate seizure. There is not even a requirement that the plaintiff provide any information to the court on these matters. The State acts largely in the dark." [30]

Because the New Motor Vehicle Board is given no control over a competitor's power temporarily to enjoin the establishment or relocation of a dealership, that body's authority in this respect is also wielded in the dark. The result is the unconstitutional exercise of uncontrolled government power.

---

[30] See also *Mitchell* v. *W. T. Grant Co.*, 416 U. S. 600, 615–617; *Gibson* v. *Berryhill*, 411 U. S. 564, 578–579; *Washington ex rel. Seattle Title Trust Co.* v. *Roberge*, 278 U. S. 116, 121–122; *Eubank* v. *City of Richmond*, 226 U. S. 137, 143–144.

The Court places great store in the fact that the California Legislature, rather than some administrative or adjudicative body, stands behind the deprivation at issue in this case. *Ante*, at 105. But, as *Fuentes* indicates, a legislative abdication of power to private citizens who are prone to act arbitrarily is no less unconstitutional than the arbitrary exercise of that power by the state officials themselves.

There is no blinking the fact that the California statute gives private parties, serving their own private advantage, the unfettered ability to invoke the power of the State to restrain the liberty and impair the contractual arrangements of their new competitors. Such a statute blatantly offends the principles of fair notice, attention to the merits, and neutral dispute resolution that inform the Due Process Clause of the Fourteenth Amendment. This statute simply cannot bear the Court's creative recharacterization as a general—and substantively constitutional—rule governing when and how dealerships may be established and relocated.[31] Accordingly, I respectfully dissent.

---

[31] Although the Court reads my opinion differently, see *ante*, at 106, I do not imply that there would be any constitutional defect in a statute imposing a general requirement that no dealer may open or relocate until after he has obtained an approval from a public agency. Nor do I imply that the appellees have an interest that may not be suspended except on a case-by-case basis. If, however, a State mandates a case-by-case determination of one private party's rights, the State may not confer arbitrary power to make that determination on another private party.