

# THE ATTORNEY GENERAL
# OF TEXAS

June 16, 1987

JIM MATTOX
ATTORNEY GENERAL

Mr. John R. Hale
Commissioner
Credit Union Department
914 East Anderson Lane
Austin, Texas    78752

Opinion No. JM-721

Re:  Constitutionality of House Bill
Nos. 1953 and 1531, which regulate
the sale of motor vehicles

Dear Commissioner Hale:

You inquire about the constitutionality of certain statutes and proposed amendments applying to the sale of motor vehicles. You are particularly concerned about provisions which prohibit sales of motor vehicles from locations other than a permanent sales location. Briefs submitted to us state that rental car agencies have in the past sold used cars in Texas at temporary "off-site" sales. These sales are also called "fleet" sales. Such sales are usually sponsored by credit unions that make financing available to members who purchase vehicles. Credit unions in the past have also sponsored off-site sales of new cars, held at sites which are not permanent auto dealer locations. The proposed legislation you inquire about will prevent both kinds of sales -- the off-site sales of new cars and of used rental cars. You specifically ask about House Bill No. 1531, which amends article 4413(36), V.T.C.S., and House Bill No. 1953, which amends article 6686, V.T.C.S.

Article 4413(36), V.T.C.S., the Texas Motor Vehicle Commission Code, regulates the distribution and sale of new motor vehicles in this state. V.T.C.S. art. 4413(36), §§1.01, 1.02. It provides that no one may act as a dealer of new motor vehicles without obtaining a license from the Motor Vehicle Commissioner. Dealers may carry on the business of a dealership at more than one location, if the separate location is expressly authorized by the dealer's franchise and license. V.T.C.S. art. 4413(36), §4.02(c)(1). Licensees may not participate in a "new motor vehicle show or exhibition at which new motor vehicles are offered for sale" unless the Motor Vehicle Commission has granted its approval. Id. House Bill No. 1531, pending before the 70th Legislature, would prohibit the sale of any new motor vehicle, except a motor home, at a show or exhibition. House Bill No. 1531, 70th Leg., (1987) (proposing amendment to section

4.02(c)(2) of article 4413(36)). Thus, the off-site sale of a group of new cars would be prohibited if House Bill No. 1531 is enacted.[1]

Article 6686, V.T.C.S., permits dealers in motor vehicles to apply for a general distinguishing number and a master dealer's license plate, instead of registering vehicles individually. An automobile dealer must have "a currently valid general distinguishing number" assigned by the Department of Highways and Public Transportation, and may not reassign a certificate of title or other evidence of ownership without one. V.T.C.S. art. 6686(a)(1-A). These requirements apply to dealers in new or used cars.

To apply for a general distinguishing number, an individual must file a sworn application with the department showing, among other things:

> (A) that the location for which the applicant seeks the issuance of a general distinguishing number is an established and permanent place of business situated on real property owned, or leased by him under a written lease for a term of not less than one year, on which the applicant maintains a permanent furnished office for the sale of vehicles of the type specified in his application. . . .
>
> (B) that the applicant intends to remain in business for at least one year at the specified location. . . .

V.T.C.S. art. 6686(a)(1-A)(vi)(A), (B) (enacted by Acts 1985, 69th Leg., ch. 465, at 1633).

House Bill No. 1953, enacted by the regular session of the 70th Legislature, requires a separate general distinguishing number for any location from which the person engages in business. H.B. No. 1953, 70th Leg. (1987) (amending V.T.C.S. art. 6686(a)(1) (iii), (v)). In addition, the dealer's sworn application for a general distinguishing number would have to state that the applicant intends to remain engaged in business as a dealer for at least one year at the specified

---

1. A brief submitted in connection with this request argues that the present version of section 4.02(c)(2), as interpreted by the Texas Motor Vehicle Commission, allows participation in bona fide trade shows and exhibitions only where a sale of vehicles is an incidental purpose. Thus, "parking lot sales" which have as their primary purpose the sale of vehicles may not be authorized by the statute.

location and that he or his employee will be there to engage in business during reasonable and lawful business hours. Id. (amending V.T.C.S. art. 6686(vi)(B)).

These provisions on location will prevent both fleet sales of rental cars and off-site sales of new cars. You question the constitutional validity of legislation which restricts the sale of vehicles by dealers that do not operate from a permanent location. You first ask whether either or both of the bills could be construed as an attempt by the legislature to pass a special law regulating the automobile trade by effectively prohibiting some persons from engaging in that trade. This question raises issues under the equal protection clause and the due process clause of the Fourteenth Amendment to the United States Constitution.

The legislation distinguishes between persons who offer motor vehicles for sale from a permanent business location virtually every business day and those who wish to offer motor vehicles for sale occasionally from a location only temporarily devoted to that purpose. There is no fundamental right to engage in the business of selling motor vehicles; therefore, the legislature needs only a rational basis. for treating persons differently according to their particular mode of selling motor vehicles. See City of New Orleans v. Dukes, 427 U.S. 297 (1976). Under the rational relationship test, a statute will be sustained if the legislature could have reasonably concluded that the challenged classification would promote a legitimate state purpose. See, e.g., Exxon Corp. v. Eagerton, 462 U.S. 176, 195 (1983); Allied Stores v. Bowers, 358 U.S. 522, 530 (1959).

Article 4413(36), V.T.C.S., includes the following purpose clause:

> The distribution and sale of new motor vehicles in this State vitally affects the general economy of the State and the public interest and welfare of its citizens. It is the policy of this State and the purpose of this Act to exercise the State's police power to insure a sound system of distributing and selling new motor vehicles through licensing and regulating the manu- facturers, distributors, and franchised dealers of those vehicles to provide for compliance with manufacturer's warranties, and to prevent frauds, unfair practices, discriminations, impositions, and other abuses of our citizens.

V.T.C.S. art. 4413(36), §1.02.

A brief submitted to us indicates that the proposed legislation will serve to protect purchases by prohibiting car sales by un-licensed, unfranchised "fly-by-night" dealers. Such dealers cannot repair motor vehicles. They have no capital investment in the facility from which they sell. Therefore, they cannot provide the services necessary to keep the vehicles they sell in good condition. The proposed legislation protects consumers from sales methods which might leave them in possession of a defective vehicle without any practical method of holding the dealer accountable.

Another brief argues that House Bill No. 1953 is anti-consumer, because credit union members are satisfied with "off-site" sales. It also argues that consumers are sufficiently protected under existing law, because the vehicles have warranties and complete service records. In the event of problems, the consumer may seek recourse under the Deceptive Trade Practices Act. The consumer saves money on the price of his purchased vehicle, and the car rental rates offered by the rental companies reflect the savings they realize by selling their used vehicles.

The view that House Bill No. 1953 is anti-consumer is supported by a letter from the Chicago Regional Office of the Federal Trade Commission on similar Illinois legislation. A letter to the minority whip of the Illinois House of Representatives commented on legislation which would have prohibited fleet sales by rental car agencies. Letter from John M. Peterson, Acting Director, Chicago Regional Office of the Federal Trade Commission to John W. Hallock, Jr. Minority Whip, Illinois House of Representatives, Nov. 13, 1986. The letter stated that the bill was contrary to the public interest because it would unnecessarily restrain competition in the used car market. Its principal effect would be to increase costs to consumers in the used car market. Existing licensing requirements appeared sufficient to address concerns about unscrupulous dealers. Id.

Acts of the legislature are presumed valid. Anniston Mfg. Co. v. Davis, 301 U.S. 337 (1937). When someone alleges that a statute involves a classification denying the equal protection laws, he has the burden of proving that it is essentially arbitrary. Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456 (1981).

An Attorney General Opinion cannot evaluate the factual bases of statements for and against the proposed legislation. The arguments and information provided to us do not, on their face, refute any possibility that there is a rational basis for these bills. We must conclude that the legislature reasonably believed that the proposed restrictions on motor vehicle sales would protect Texas consumers from fraud and unfair practices by "fly-by-night" dealers. We cannot say that the proposed enactments violate the equal protection clause. Cf. Calvert v. McLemore, 358 S.W.2d 551 (Tex. 1962) (statute violating

article VIII, section 2, of the Texas Constitution which requires reasonable basis for classifying and exempting persons engaged in same occupation for occupation tax).

An economic regulation challenged under the Fourteenth Amendment on substantive due process grounds will not be overturned if

> there is an evil at hand for correction, and . . .
> it might be thought that the particular legisla-
> tive measure was a rational way to correct it.

Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 488 (1955). The court will not strike down state business regulations merely because "they may be unwise, improvident, or out of harmony with a particular school of thought." Id.

Article I, section 19, of the Texas Constitution also provides for due process of law:

> No citizen of this State shall be deprived of
> life, liberty, property, privileges or immunities,
> or in any manner disfranchised, except by the due
> course of the law of the land.

We note that the opinions from other states, and the commentaries of scholars, tend to place statutory provisions like the one at hand in a very critical light, at least insofar as the guarantees against the deprivation of liberty without due process of law in various state constitutions are found to extend meaningful protection to substantive interests in economic freedom. Our research suggests that a number of state judiciaries would examine House Bill Nos. 1953 and 1531 strictly for real evidence of the actual relationship of the means embodied in the prohibitions in the statute to the actual and purported purposes of the prohibitions. If the courts of Texas should choose to follow a similar approach to interpreting the liberty interests in the due process clause of the Texas Constitution, then we surmise that it might be difficult for this statute to pass constitutional muster. See, e.g., Defiance Milk Products Company v. Du Mond, 132 N.E. 2d 829 (N.Y. 1956); In re Certificate of Need for Aston Park Hospital, Inc., 193 S.E.2d 729 (N.C. 1973); Paulsen, "The Persistence of Substantive Due Process in the States," 34 Minn. L. Rev. 91 (1950); Comment, "Rediscovering Means Analysis in State Economic Substantive Due Process," 34 Ala. L. Rev. 161 (1983); Note, "State Economic Substantive Due Process: A Proposed Approach," 88 Yale L.J. 1487 (1978).

You next ask whether this legislation would burden interstate commerce in violation of the federal constitution. U.S. Const. art. I, §8. We assume that some of the new and used motor vehicles sold in

Texas move in interstate commerce, including some of the vehicles sold in "off-site" sales and "fleet" sales, and that the Texas regulations of the sale of motor vehicles would affect interstate commerce.

In Exxon Corporation v. Governor of Maryland, 437 U.S. 117 (1978), the Supreme Court considered a Maryland statute providing that a producer or refiner of petroleum products (1) may not operate any retail service station within the state and (2) must extend all temporary price reductions uniformly to all service stations it supplies. Although the burden of these provisions fell only on certain interstate companies, the court rejected arguments that they violated the commerce clause. It found that these provisions did not favor local production, prohibit the flow of interstate goods, or distinguish between in-state and out-of-state production. Id. at 125. The court stated that

> interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another.

Id. at 127. We believe the court's reasoning in Exxon Corporation v. Governor of Maryland supports a finding that the statutes and bills you inquire about do not violate the federal commerce clause.

You finally ask whether the Texas provisions violate state or federal antitrust provisions.

The Texas Free Enterprise and Antitrust Act of 1983 defines as unlawful various practices that lessen competition, such as monopolies and conspiracies in restraint of trade. Bus. & Comm. Code §§15.01, 15.05. However, nothing in the section defining unlawful practices

> shall be construed to prohibit activities that are exempt from the operation of the federal antitrust laws, 15 U.S.C. Section 1 et seq. Furthermore, nothing in this section shall apply to actions required or affirmatively approved by any statute of this state or of the United States or by a regulatory agency of this state or of the United States duly acting under any constitutional or statutory authority vesting the agency with such power.

Bus. & Comm. Code §15.05(g). Thus, the conduct required by the proposed statutes does not violate the state antitrust law.

We finally consider whether the proposed legislation conflicts with the Sherman Act, 15 U.S.C. §1 et seq. In Parker v. Brown, 317

U.S. 341 (1943), the Supreme Court established the "state action" exemption from the federal antitrust laws. The state, in exercising its sovereign powers, is exempted from the restraints of the federal antitrust laws.

The standards for applying the Parker v. Brown doctrine, as articulated by the federal courts, are as follows:

> 1. The alleged anticompetitive activity must be mandated by the state acting as sovereign;
>
> 2. The challenged restraint must be clearly articulated and affirmatively expressed as state policy, and the policy must be actively supervised by the state itself.
>
> 3. Some decisions indicate that the importance of the state's regulatory interest is also to be considered.

Annot., 70 L. Ed.2d 973 (1983).

In New Motor Vehicle Board v. Orrin W. Fox Co., 439 U.S. 96 (1978) the Supreme Court considered whether California statutes governing the establishment or relocation of new-car dealerships violated the Sherman Act. The statutes required that an automobile manufacturer that wanted to add dealerships to the market area of its existing franchises must notify the existing franchisees as well as the New Motor Vehicle Board. If an existing franchise filed a protest with the board, the manufacturer could not open the proposed dealership until the board heard the protest and determined its merits.

An automobile manufacturer and the proposed franchisees sought to declare the statutes invalid as violating the Sherman Act, among other grounds. They argued that

> by delaying the establishment of automobile dealerships whenever competing dealers protest, the state scheme gives effect to privately initiated restraints on trade.

Id. at 109. The court stated that the California regulatory scheme was

> a system of regulation, clearly articulated and affirmatively expressed, designed to displace unfettered business freedom in the matter of the establishment and relocation of automobile dealerships. The regulation is therefore outside the

> reach of the antitrust laws under the 'state action' exemption.

Id. The court also countered the argument that the legislation conflicted with the Sherman Act because it allowed the auto dealers to invoke state power to restrain competition. Quoting Exxon Corporation v. Governor of Maryland, the court observed that there was a conflict between the statute and the central policy of the Sherman Act, but that

> this sort of conflict cannot itself constitute a sufficient reason for invalidating the . . . statute. For if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed.

439 U.S. at 111 (quoting Exxon Corporation v. Governor of Maryland, 437 U.S. at 133). In our opinion, the proposed enactments do not violate either the state or the federal antitrust laws.

## S U M M A R Y

> House Bill Nos. 1531 and 1953 of the 70th Legislature restrict the locations from which new and used cars may be sold. These proposed restrictions do not on their face violate the equal protection clause, the due process clause, or the commerce clause of the United States Constitution. Nor do they violate the Texas Antitrust and Free Enterprise Act of 1983, Tex. Bus. & Comm. Code §§15.01 et seq., nor the Sherman Act, 15 U.S.C. §1 et seq. Scholarly authorities and cases from other states on due process requirements of state constitutions, if adopted by the Texas Supreme Court, suggest that these bills would violate article I, section 19 of the Texas Constitution.

Very truly yours,

J I M   M A T T O X
Attorney General of Texas

JACK HIGHTOWER
First Assistant Attorney General

MARY KELLER
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Susan L. Garrison and
Donald Bustion
Assistant Attorneys General