IN RE APPLICATION OF GENERAL MOTORS CORPORATION, A DELAWARE CORPORATION. GENERAL MOTORS CORPORATION, A DELAWARE CORPORATION, APPELLANT, V. O'DANIEL OLDSMOBILE, INC., A NEBRASKA CORPORATION, APPELLEE.

439 N.W.2d 453

Filed May 5, 1989.   No. 87-434.

Stephen H. Nelsen and Shawn D. Renner, of Cline, Williams, Wright, Johnson & Oldfather, and H. Richard Elmquist for appellant.

Martin A. Cannon, of Matthews & Cannon, P.C., for appellee.

BOSLAUGH, WHITE, SHANAHAN, and FAHRNBRUCH, JJ., and WITTHOFF, D.J.

WHITE, J.

This· is an appeal taken by General Motors Corporation (General Motors) following a determination by the Nebraska Motor Vehicle Industry Licensing Board (board) denying General Motors' application for a new dealer point in the Omaha multiple dealer area. This appeal is taken pursuant to the Nebraska Administrative Procedure Act, specifically, Neb. Rev. Stat. § 84-918 (Reissue 1981) (see Neb. Rev. Stat. § 60-1435 (Reissue 1988)). The decision of the board was entered pursuant to the powers granted to it by Neb. Rev. Stat.

§§ 60-1415, 60-1422, and 60-1434 (Reissues 1984 & 1988). Specifically, the board found that General Motors had not established the need for a new dealer point because it had not met the good cause requirement of § 60-1434 (Reissue 1988). Appeals from the district court to this court in cases involving administrative orders are heard de novo on the record. § 84-918. Because our review is de novo, the facts in this case must be examined in detail. However, before an exhaustive review is taken, a brief perusal of the relationship of the parties to this action must be undertaken.

Before this examination is commenced, some terms used by General Motors in conducting its corporate surveys must be defined. Multiple dealer areas (MDAs), an internal geographical designation given by General Motors, one of which includes Omaha and Council Bluffs, Iowa, are broken down into AGSSAs. AGSSA is an acronym for area of geographic sales and service advantage. The division of MDAs into AGSSAs is based on census tract maps and registration data provided by R.L. Polk Company, the primary source for registration data in the automotive industry. The AGSSAs are established by reference to distances from the dealerships, traffic flows, and natural barriers. The AGSSAs are used solely for the purpose of General Motors' evaluations and do not represent assigned boundaries for dealers.

In 1958, Bernard O'Daniel came to Omaha to take over the only Oldsmobile dealership in Omaha. Nearly 30 years later, the O'Daniel dealership, O'Daniel Oldsmobile, Inc. (O'Daniel), remains the only Oldsmobile dealership in the city of Omaha. However, throughout this period there have been two Oldsmobile dealerships in the Omaha MDA. The other Oldsmobile dealer in the Omaha MDA is McIntyre Oldsmobile-Cadillac, Inc., located in Council Bluffs, Iowa. General Motors had two witnesses testify in support of its application for a new dealership. John Currey, Oldsmobile's Omaha zone manager, testified concerning General Motors' lengthy evaluation of the Omaha market to determine whether an additional dealership would be appropriate. Further, Currey testified regarding the performance of both O'Daniel and McIntyre. Luigi DiLalla was the other witness called by General

Motors. He is a member of the General Motors survey department. The survey department has the responsibility of independently evaluating market areas to assist in determining whether a new dealer point should be established.

Two witnesses also testified on O'Daniel's behalf. Bernard and Michael O'Daniel, the chairman of the board and president, respectively, testified concerning the investment made in the O'Daniel dealership through the years and the contacts they have had with the management of General Motors.

The process for determining whether a new dealer point was necessary to ensure adequate representation of the growing Omaha area was explained in detail by Currey. In 1980, when Currey became manager of the Omaha zone, he analyzed the markets and determined that the dealers were not performing as well as an average dealer in the zone. Finally, in August of 1982, he told O'Daniel that he would recommend General Motors do a survey to see if additional representation was needed in the area. A survey was conducted by General Motors. This survey considered, among other things, the sales registrations in the various AGSSAs, dealer profit, and the experience of the existing dealers. If the dealer is not found to be particularly profitable, General Motors will initially see if this inefficiency is due to an operation difficulty rather than evidence of need for an additional dealer. Additionally, General Motors examines demographics regarding population, population trends, and population income. Both McIntyre and O'Daniel were notified of the preliminary conclusion to seek an additional dealership and were invited to offer any input they felt relevant. Neither dealer offered any input into the evaluation process. After the survey was completed, on July 2, 1984, General Motors sent letters to O'Daniel and McIntyre notifying them of its decision to proceed with the establishment of an additional dealer point in the southwest sector of the MDA.

The appellant, General Motors, assigns two errors. General Motors contends the district court erred in affirming the licensing board's order, which failed to give due consideration to all material elements of the licensing act relating to the

General Motors application, and in finding that the licensing board's order is supported by the evidence.

In reviewing a record de novo, "this court is to retry issues of fact and reach an independent conclusion as to what finding or findings are required under the pleadings and all the evidence, without reference to the conclusion reached in the district court . . . ." *Schmeckpeper v. Koertje*, 222 Neb. 800, 803, 388 N.W.2d 51, 53-54 (1986).

Although we have not as yet decided an appeal from a licensing board decision to deny a requested franchise, pursuant to § 60-1434, we have decided actions prosecuted under the statute based upon termination of a franchise. See *American Motors Sales Corp. v. Perkins*, 198 Neb. 97, 251 N.W.2d 727 (1977). Nebraska is not alone in having this type of regulatory legislation regarding the establishment or termination of motor vehicle franchises. A similar California statute was held constitutional by the U.S. Supreme Court in *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S. Ct. 403, 58 L. Ed. 2d 361 (1978). It is primarily the disparity in bargaining power between automobile manufacturers and their dealers that prompted Congress, Nebraska, and at least 23 other states to enact legislation to protect retail car dealers from perceived abusive and oppressive acts by the manufacturers. See *New Motor Vehicle Bd. of Cal., supra*.

The Nebraska motor vehicle industry licensing act, Neb. Rev. Stat. §§ 60-1401 to 60-1440 (Reissues 1984 & 1988), contains the requirements that franchisors must comply with before establishing an additional dealership for a line-make already represented within a community. Section 60-1422 (Reissue 1988) provides:

> No franchisor shall enter into any franchise for the purpose of establishing an additional motor vehicle . . . dealership in any community in which the same line-make is then represented, unless the franchisor has first established in a hearing held under the provisions of this act that there is good cause for such additional motor vehicle . . . dealership under such franchise, and that it is in the public interest.

Section 60-1434 (Reissue 1988) provides guidance to the board when it is making its "good cause" determination concerning the granting of a new franchise:

> In determining whether good cause has been established for entering into an additional franchise for the same line-make, the board shall take into consideration the existing circumstances, including, but not limited to:
>
> (1) Amount of business transacted by other franchisees of the same line-make in that community;
>
> (2) Investment necessarily made and obligations incurred by other franchisees of the same line-make, in that community, in the performance of their part of their franchises;
>
> (3) Permanency of the investment;
>
> (4) Effect on the retail motor vehicle business as a whole in that community;
>
> (5) Whether it is injurious to the public welfare for an additional franchise to be established; and
>
> (6) Whether the franchisees of the same line-make in that community are providing adequate consumer care for the motor vehicle, combination motor vehicle and trailer, motorcycle, or trailer products of the line-make which shall include the adequacy of motor vehicle, combination motor vehicle and trailer, motorcycle, or trailer dealer service facilities, equipment, supply of parts and qualified service personnel.

The appellant contends that the district court was in error in affirming the licensing board's order because the board failed to give consideration to all material elements of the licensing act. Whether the board committed error in its considerations need not concern us in this appeal, however, because our review is de novo, and, consequently, we must make independent factual findings. In light of our standard of review, we will examine each statutory criterion in detail.

It is important to note that the franchisor, General Motors, has the burden of establishing the existence of good cause for establishing the dealership and that such dealership is in the public interest. § 60-1422. In determining good cause, we

consider the following.

I. "AMOUNT OF BUSINESS TRANSACTED BY OTHER FRANCHISEES OF THE SAME LINE-MAKE IN THAT COMMUNITY." § 60-1434(1).

1. In the Omaha community, there are currently two Oldsmobile dealers: McIntyre and O'Daniel. This community was defined by General Motors. General Motors divides its dealers into MDAs, one of which includes both O'Daniel and McIntyre as members.

2. O'Daniel sold just over 1,000 cars in 1985.

3. O'Daniel sold almost every car supplied and contends it would have sold more had more cars been supplied.

4. However, how many cars O'Daniel was to have available for sale was determined by a General Motors distribution system based upon past sales rates and current inventory. This system applies equally to all Oldsmobile dealers throughout the nation.

5. In order to present a frame of reference within which to consider the amount of business conducted by McIntyre and O'Daniel, these sales data need to be compared to performance levels of other Oldsmobile dealers, both nationally and throughout the Omaha zone.

6. General Motors compares the Oldsmobile registrations in a given MDA to the total industry registrations in the MDA to determine Oldsmobile's percentage of the market, and then compares that percentage to both national and zone average percentages.

7. The Omaha zone is comprised of similar markets in Nebraska, Iowa, and South Dakota.

8. A review of the information provided by a comparison of Oldsmobile's percentage of the market in the Omaha zone shows that McIntyre and O'Daniel failed to perform to zone average during any of the years examined (1980 to 1984).

9. Both McIntyre and O'Daniel failed to perform to national average during any of the referenced years.

10. The effectiveness of dealers is based on both sales and registrations in a community. With respect to each dealer, a determination of exactly how many Oldsmobiles are registered in the community is made, and this amount is compared to the

number of sales the respective dealer made. This ratio determines the effectiveness of the individual dealer.

11. Under this system, O'Daniel has not been rated effective for the past 5 years. McIntyre was rated effective once, in 1980.

12. Based upon the same rating system for all dealers, most of the dealers in the Omaha zone, other than O'Daniel and McIntyre, are rated effective.

II. "INVESTMENT NECESSARILY MADE AND OBLIGATIONS INCURRED BY OTHER FRANCHISEES OF THE SAME LINE-MAKE IN THAT COMMUNITY . . . ." § 60-1434(2).

1. There is no evidence in the record of McIntyre's investment.

2. The statute states "investment necessarily made." This means the investment that *must* be made by the existing franchisee in order to maintain the dealership up to the "guide" set by General Motors for its Oldsmobile dealers.

3. Bernard O'Daniel testified that he estimated the dealership investment to be $3 million. Specifically, however, he stated the following approximate value of his assets:

a. The initial land was purchased in 1963. The first 3 acres were purchased at a cost of $250,000. The original building was constructed at a cost of approximately $450,000;

b. O'Daniel added 2 acres $1^{1}/_{2}$ years later at a cost of approximately $125,000. At that time, after the acquisition of this additional property, O'Daniel was up to the "guide" set by General Motors for its Oldsmobile dealers.

c. O'Daniel purchased an additional 3 acres to the east, but this investment was incurred partially for O'Daniel's investment in a Honda franchise. This purchase was not required by Oldsmobile.

d. Four or five years ago O'Daniel spent approximately $400,000 on a new 30-bay body shop, with the approval of Oldsmobile. No objection was received by General Motors when Bernard O'Daniel told it he was planning to construct this body shop; however, this investment was not required by General Motors.

III. "PERMANENCY OF THE INVESTMENT." § 60-1434(3).

The statute does not specify whether the board is to consider the permanency of the investment of only the present dealers, or the investment of both the present dealers and the proposed dealer. Because the statute is unclear, little evidence was adduced on the permanency of the proposed investor, as the appellant presumed that the statute was referring only to the current dealers. We will, however, consider what little evidence was admitted on the issue of the permanency of the proposed investment.

1. O'Daniel has been a franchised Oldsmobile dealer since 1958, and has been located at 78th and Dodge Streets in Omaha, Nebraska, since the end of 1965. O'Daniel is also a Honda franchisee.

2. O'Daniel has a substantial permanent investment at its present location. The facilities and land are valued at over $1 million, as discussed above.

3. General Motors holds an option on the land proposed by Oldsmobile for the new dealership. The land is valued at $500,000.

4. Currey testified that the total investment in this new dealership will be in excess of $1.3 million.

IV. "EFFECT ON THE RETAIL MOTOR VEHICLE BUSINESS AS A WHOLE IN THAT COMMUNITY." § 60-1434(4).

1. O'Daniel has been a franchised dealer of Oldsmobiles since 1958 and has remained at its current location since 1965.

2. The population of the Omaha area has increased 67 percent since 1950.

3. Generally, when populations increase, the needs of customers will increase.

4. The majority of the growth in the Omaha area is in the west and southwest areas of Omaha.

5. The majority of the population in Omaha is still within the O'Daniel AGSSA.

6. The proposed dealer is 7.7 miles to the west of O'Daniel and 17 miles to the west of McIntyre.

7. For McIntyre, only 25 percent of sales made are to customers more than 10 miles from the dealership.

8. For O'Daniel, only 25 percent of sales made are to

customers more than 6 miles from the dealership.

9. Oldsmobile is the third-largest-selling line-make in the industry.

10. Oldsmobile is represented less in the Omaha area than virtually all other line-makes except Volkswagen and Cadillac.

11. Buick and Mercury are two of the makes Oldsmobile directly competes with, and they are each represented by three dealers in the Omaha area.

V. "WHETHER IT IS INJURIOUS TO THE PUBLIC WELFARE FOR AN ADDITIONAL FRANCHISE TO BE ESTABLISHED." § 60-1434(5).

1. The establishment of a new dealership in the Omaha area would inject approximately $1.3 million into the Omaha economy.

2. Presumably, the existence of another Oldsmobile dealership would increase the availability of jobs in the Omaha community.

3. There was no evidence that the establishment of a new dealership would result in any loss of employment for O'Daniel employees.

4. Other line-makes in the Omaha area are each represented by at least three dealers, with the exception of Cadillac and Volkswagen.

5. Generally speaking, when competition is increased, lower prices and better service are a result of this increased competition.

6. Because most of the growth in the Omaha area is to the west, the establishment of a third dealer in the proposed area should result in greater convenience for members of the Omaha community.

VI. "WHETHER THE FRANCHISEES OF THE SAME LINE-MAKE IN THAT COMMUNITY ARE PROVIDING ADEQUATE CONSUMER CARE FOR THE MOTOR VEHICLE . . . SERVICE FACILITIES, EQUIPMENT, SUPPLY OF PARTS AND QUALIFIED SERVICE PERSONNEL." § 60-1434(6).

1. General Motors was not allowed to present evidence regarding the quality of customer care rendered by McIntyre. This nonreceipt of evidence was error, as the statute clearly

contemplates that the board will consider whether *all* the franchisees of the same line-make in the community are providing adequate consumer care. However, as we have no evidence on this issue, we can only consider O'Daniel.

2. Currey, the Omaha zone manager for the past 5-plus years, testified, "[O'Daniel] has been up and . . . has been down. I would say [O'Daniel's] service has been adequate."

The determination of whether good cause exists for the establishment of a new Oldsmobile dealership in the Omaha area is a difficult one. However, based on the foregoing analysis of the factors contained within § 60-1434, it is the opinion of this court that the decision of the district court must be reversed. General Motors has shown good cause to establish a new dealership, and we feel that the additional dealership is in the public interest.

The judgment of the district court affirming the findings of the Nebraska Motor Vehicle Industry Licensing Board is hereby reversed.

REVERSED.

CAPORALE, J., concurring.

Although I was not a member of the fractional unit of the court resolving this case and although I agree with the result, I must nonetheless object to the dictum which comments on the decisions other courts have reached concerning the constitutionality of similar statutes. The question of constitutionality simply is not present in this case. Indeed, had it been present, the case would have required consideration and decision by the court en banc. Neb. Const. art. V, § 2.

I strongly suspect that if franchisees not receiving the same protection as automobile franchisees nevertheless operate under market forces which are functionally the same as those under which automobile franchisees operate, there exists a very serious special legislation question under the provisions of Neb. Const. art. III, § 18.