**FUTURE FORD SALES, INC., d/b/a Sheehy Ford and Bayshore Ford Truck Sales, Inc., Appellants Below, Appellants,**

v.

**PUBLIC SERVICE COMMISSION OF the STATE OF DELAWARE, Appellee,**

and

**Ford Motor Company, Appellee Below, Appellee.**

No. 241, 1994.

Supreme Court of Delaware.

Submitted: Jan. 23, 1995.
Decided: March 3, 1995.

Robert J. Katzenstein and Brett D. Fallon, Smith, Katzenstein & Furlow, Wilmington, and Daniel E. Myers and Walter E. Forehand (argued), Myers & Forehand, Tallahassee, FL, for appellants.

William E. Manning, Duane, Morris & Heckscher, Wilmington, and Carey P. De-Deyn (argued), Sutherland, Asbill & Brennan, Atlanta, GA, and Nicholas T. Christakos, Sutherland, Asbill & Brennan, Washington, DC, for appellee, Ford Motor Co.

Before WALSH and HOLLAND, JJ., and DUFFY, J., Retired.*

WALSH, Justice.

In this appeal from the Superior Court, we address for the first time the application of the Motor Vehicle Franchising Practices Act (the "Act"), 6 *Del.C.* Ch. 49, in a dispute between an automobile manufacturer and existing dealerships. The Delaware Public Service Commission (the "Commission"), which is charged with administrative responsibility for enforcement of the Act, rejected the protests of the appellants, Future Ford Sales, Inc. d/b/a Sheehy Ford ("Future Ford") and Bayshore Ford Truck Sales, Inc. ("Bayshore"), against the proposed establishment by the appellee Ford Motor Company ("Ford") of a new dealership within the City of Wilmington. The Commission, in adopt-

ing a Hearing Examiner's findings and recommendations, ruled that "good cause exists" to permit Ford to establish a new franchise at the site requested. The Superior Court affirmed the Commission's order as supported by substantial evidence and free of any error of law.[1]

Future Ford and Bayshore allege two errors in the Superior Court's affirmance. They contend that the matter was not ripe for adjudication by the Commission because of the uncertainty and contingencies surrounding Ford's application. Second, they argue that the Hearing Examiner erred in according preferential weight to one of the statutory factors mandated for consideration under 6 *Del.C.* § 4915(c). We agree that the Hearing Examiner erred in the application of the statutory factors and that this fundamental error also permeated the Commission's order. Accordingly, we reverse and remand for future proceedings.

With respect to the appellant's "ripeness" contention, as we view the record we are not satisfied that the evidence supports the Superior Court's rejection of that claim. Accordingly, incident to our remand, we will permit Ford to supplement the record before the Commission to demonstrate that the conditions and contingencies attached to its franchise offer have been satisfied, or are subject to easy resolution.

I

Our statement of the facts is drawn, essentially, from the procedural history contained in the Hearing Examiner's report. Although the parties differ concerning the inferences to be drawn from the Hearing Examiner's findings, they are in basic agreement concerning the background of Ford's application.

In determining the location of franchises, Ford, like other automobile manufacturers, attempts to allocate dealerships based on population and marketing data. Certain areas may be designated as a "Multiple Point," which is a market area designated by Ford in which two or more Ford car and light truck dealerships are authorized to sell and service

* Sitting by designation pursuant to Supreme Court Rule 2 and Del. Const. art. IV §§ 12 and 38.

1. Although named as an appellee, the Commission took no position in this appeal.

Ford products. The Wilmington Multiple Point encompasses all of northern New Castle County. To each dealer within the multiple point Ford assigns a Primary Market Area ("PMA"), which consists of specifically identified census tracts in the vicinity of the dealership from which it is expected that most of the sales and service opportunities will be realized. PMAs are subject to periodic adjustment as factors, such as sales and population trends, change. Although the PMAs are designed to achieve a certain balance with the multiple point, they are not considered exclusive sales territories since each multiple point dealer is free to sell to anyone adjacent to the multiple point. In fact, it is not uncommon for there to be considerable sales overlap between dealers.

Prior to June, 1991, Ford had four car and light truck dealerships in the Wilmington Multiple Point: Sheehy (Future Ford), Castle Ford, Winner Ford and Freedom Ford. Bayshore was also within the multiple point but was considered a full-line truck center. Freedom Ford was the only dealership located within the City of Wilmington, but it also serviced the central and northern suburban areas, extending to Pennsylvania. Historically, Ford has had a dealer representative in Wilmington since at least 1925, with one located for a number of years in the Union Park area in the western part of the City. In June of 1991, Freedom Ford closed its facility because of financial problems and formally terminated its franchise with Ford in November of that year. Ford claims that the closing of this dealership was attributed to the owners' personal financial difficulties rather than to lack of product interest.

The area in which Freedom Ford formerly operated is not viewed as a viable retail locale. Other retail establishments, including two automobile dealerships, have left the area. Ford's search for another Wilmington location led it to conclude that the area in the vicinity of Union and Pennsylvania Avenue would be suitable. In the summer of 1992, Ford discussed with other Ford dealers in the Wilmington Multiple Point the prospect of filling the vacancy. The dealers apparently did not object to the filling of the open point but expressed concern over the location proposal.

Following its unsuccessful approach to the other dealers in the Wilmington Multiple Point, Ford, acting pursuant to 6 *Del.C.* § 4915(a), formally notified the Public Service Commission and each new Ford dealer in the "relevant market area"[2] of its intention to relocate the former Freedom Ford dealership. The notice indicated an intention to transfer the dealership to Anthony Ursomarso, who, with other members of his family, owns a complex of dealerships for Pontiac/GMC, Honda and BMW automobiles at the location of Pennsylvania Avenue and Union Street. Future Ford and Bayshore, the two dealers in the relevant market area, filed timely protests with the Commission, but later withdrew their protests, without prejudice, in order to pursue their grievance against Ford before Ford's Dealer Policy Board. This body, which operates independently of Ford management, received presentations from both Ford and the protesting dealers and upheld Ford's position. Future Ford and Bayshore then refiled their protests with the Commission which, in turn, referred the dispute to a hearing examiner for findings and recommendations.

The Hearing Examiner conducted an evidentiary hearing over the course of four days. In addition to fact witnesses, the parties presented competing expert testimony on the demographics and automobile sales projections for the relevant market area. The basic thrust of Ford's presentation was that its marketing studies indicated that the absence of a successor to Freedom Ford created an unfilled need for a Ford dealer in the growing northern New Castle County marketing area. It also contended that the effect of an additional car/light dealer in the PMA would be of minimal detriment to Bayshore, a full range truck dealer which does not sell passenger vehicles. With respect to Future Ford, Ford acknowledged that Future Ford has a substantial investment in its

---

**2.** The "relevant market area" is defined as "the area within a radius of 10 miles from the intended site of a proposed additional dealership, ex-cept that in New Castle County the radius shall be 7 miles from the intended site of a proposed additional dealership." 6 *Del.C.* § 4902(10).

operations on the Kirkwood Highway, but argued that it has been and will continue to be a profitable dealership. It noted that Future Ford is 4.7 miles from the proposed location and approximately 7 miles from the former Freedom Ford dealership. The establishment of a new dealership would, in Ford's view, merely restore the competitive balance in effect prior to 1991.

The basic position of Future Ford and Bayshore before the Hearing Examiner was that the present level of competition in the relevant market area is adequate and that the establishment of an additional Ford dealership at the Ursomarso location would constitute "overdealing." In particular, Bayshore objected to permitting the new dealership to sell light trucks. Future Ford presented evidence of the substantial investment it has made in its dealership. It argued that it would be placed at serious risk with increased competition from a location much closer than the previous Freedom Ford dealership. Future Ford and Bayshore also attacked the accuracy of Ford's marketing studies and sales projections.

In a lengthy report to the Commission, the Hearing Examiner discussed in detail the evidence presented by the parties, and evaluated that evidence in light of the factors which the Commission is required to consider in determining whether good cause exists for the establishment or relocation of a new dealership. Under 6 *Del.C.* § 4915, the Commission is required to "take into consideration the existing circumstances, including, but not limited to:

(1) Permanency of the investment of both the existing and proposed new motor vehicle dealers;

(2) Growth or decline in population and new car registrations in the relevant market area;

(3) Effect on the consuming public in the relevant market area;

(4) Whether it is injurious or beneficial to the public welfare for an additional new motor vehicle dealer to be established;

(5) Whether the new motor vehicle dealers of the same line-make in that relevant market area are providing adequate competition and convenient customer care for the motor vehicles of the line-make in the market area which shall include the adequacy of motor vehicle sales and service facilities, equipment, supply of motor vehicles parts and qualified service personnel;

(6) Whether the establishment of an additional new motor vehicle dealer would increase competition, and therefore be in the public interest;

(7) The effect on the relocating dealer of a denial of its relocation."

6 *Del.C.* § 4915(c).

Although the Hearing Examiner analyzed the evidence presented by the parties in categorical fashion, in applying the § 4915(a)(c) factors, he noted that "the primary purpose of the Act is 'clearly' to promote the public interest and the public welfare," and the interests of existing dealers, while a regulatory consideration, assumes "a secondary position." The Hearing Examiner concluded by finding that while the proposed dealership at the Union Park site would increase competition to Bayshore and Future Ford, it would not adversely affect their profitability. In any event, he reasoned that any increased competition would be in the public interest. Accordingly, the Hearing Examiner recommended that the Commission allow Ford to proceed to establish the new dealership at the Union Park site as part of the Wilmington Multiple Point.

Bayshore and Future Ford filed exceptions to the Hearing Examiner's report to the Commission which permitted oral argument on the exceptions. In a brief order dated September 21, 1993, the Commission adopted the Hearing Examiner's report and recommendations *in toto.*

Bayshore and Future Ford appealed the Commission's decision to the Superior Court as authorized by 6 *Del.C.* § 4915(f). In their appeal, the protesting dealers asserted four grounds of error, only two of which have been preserved for appeal to this Court: They argue: (i) that Ford's plans were so indefinite that the Commission did not have before it a controversy ripe for resolution and (ii) the Commission misconstrued the purpose of the Act and, as a result, it did not

give a proper weight to the interests of the protesting dealers.

In rejecting the lack of ripeness contention, the Superior Court ruled that while the Act is imprecise in providing a standard for an "intention to establish" a dealership (6 Del.C. § 4915(a)), Ford's arrangement with the Ursomarsos was sufficiently documented. The court rejected as "too formalistic" the protesting dealers' claim that Ford had made no final commitment to anyone. With respect to the appellants' misinterpretation argument, the Superior Court acknowledged that the Act "does not create a hierarchy" of purposes and that the Commission drew a theoretical distinction between the public interest and the protection of investments of existing dealers. Nevertheless, the Court ruled that the two concepts are not irreconcilable, and since the Commission expressly found that the proposed dealership would not materially or adversely affect the profitability of the protesting dealers, the appellants were not prejudiced by the weighing process. The Superior Court concluded that the Commission's decision was free of any error of law and supported by substantial evidence and, accordingly, it affirmed. This appeal followed.

## II

■ Our review function in this appeal is, in effect, a replication of that performed by the Superior Court when hearing appeals from rulings of administrative agencies. The factual determination of the administrative body will be sustained if supported by substantial evidence, and its application of statutory standards upheld if free of error of law. *Delmarva Power & Light v. Pub. Serv. Com'n.*, Del.Supr., 508 A.2d 849, 852 (1986). Our review of statutory construction, both by

the administrative body and by the Superior Court, is plenary. *Id.* The parties are in agreement that both issues posed in this appeal, the ripeness question and the application of statutory factors, pose questions of law subject to *de novo* review.

■ We first address the appellants' assertion that the Commission, in adopting the Hearing Examiner's application of the factors to be considered under § 4915(c), ratified a fundamentally flawed construction of the statute. Ford argues that the Commission's adoption of the "public interest/public welfare" factor as a dominant consideration under § 4915(c) is not error *per se*, since five of the six factors which determine "good cause" for establishment of a new franchise relate to the public interest as distinct from the interests of existing dealers. Ford also contends that there is precedent for a hierarchial application of the statutory factors in a previous proceeding before the Commission.[3] In any event, it is argued that the Commission did weigh the interests of existing dealers in its § 4915 analysis. Thus, even if the statute was loosely interpreted, the practical result was the same.

■ The Delaware Act, like its counterpart at the federal level and in a large number of states, is remedial legislation intended to regulate the relationship between motor vehicle dealers and manufacturers. Historically, the gross disparity in bargaining power permitted motor vehicle manufacturers to exert economic pressure over franchises which prompted Congress and many states to enact regulatory legislation to prevent such abusive practices. *See, e.g., New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978) (reviewing California statute);[4] *General Motors Corp. v.*

---

**3.** The prior interpretation of § 4915 which accords a predominance to the public interest/public welfare factor occurred in a proceeding in which the Commission adopted the hierarchical analysis of the same Hearing Examiner. Since the prior proceeding was not subject to judicial review, such bootstrapping is entitled to little deference.

**4.** The Supreme Court in *Fox* relied upon a 1956 Congressional Committee Report which found that:

Dealers are with few exceptions completely dependent on the manufacturer for their supply of cars. When the dealer has invested to the extent required to secure a franchise, he becomes in a real sense the economic captive of his manufacturer. The substantial investment of his own personal funds by the dealer in the business, the inability to convert easily the facilities to other uses, the dependence upon a single manufacturer for supply of automobiles, and the difficulty of obtaining a franchise from another manufacturer all contribute

*O'Daniel Oldsmobile, Inc.,* Neb.Supr., 232 Neb. 11, 439 N.W.2d 453 (1989).

■ The federal response to the disparity problem led to the enactment of the Automobile Dealers' Day in Court Act in 1956. 15 U.S.C.A. §§ 1221–25 (West.1982) (the "federal Franchise Act"). By this legislation, Congress sought to protect automobile dealers from the abuses and arbitrary treatment which manufacturers frequently commanded over dealers by way of the manufacturers' superior bargaining position. *Blenke Bros. Co. v. Ford Motor Co.,* N.D.Ind., 203 F.Supp. 670, 671 (1962). The federal Franchise Act thus grants to an automobile dealer a federal cause of action against any automobile manufacturer who fails to act in "good faith" when dealing with the franchisee. 15 U.S.C. § 1222. The federal Franchise Act makes clear, however, that good faith or the lack of it is measured only in the context of coercion, intimidation or threats by the manufacturer. 15 U.S.C. § 1221(e); *see also Annotation, Validity and Construction of Statute Regulating Dealings between Automobile Manufacturers, Distributer, and Dealers,* 7 A.L.R.3d 1173, 1183 (1966); *Southern Rambler Sales, Inc. v. American Motors Corp.,* 5th Cir., 375 F.2d 932, 936, *cert. denied,* 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967); *Bob Maxfield, Inc. v. American Motors Corp.,* 637 F.2d 1033, *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981) (actual coercion, intimidation or threats are essential element to a cause of action under this section).

■ Like its State counterparts, the federal Franchise Act has been interpreted as an attempt to equal the bargaining position of automobile dealers and manufacturers, but it does not guarantee a dealer freedom from

toward making the dealer an easy prey for domination by the factory. On the other hand, from the standpoint of the automobile manufacturer, any single dealer is expendable. The faults of the factory-dealer system are directly attributable to the superior market position of the manufacturer.
*Orrin W. Fox Co.,* 439 U.S. at 100 n. 4, 99 S.Ct. at 407 n. 4.

5. Although the Act's validity is not here challenged, we note that state franchise practice stat-

intrabrand competition. As noted in its legislative history,

> The bill does not freeze present channels or methods of automobile distribution and would not prohibit a manufacturer from appointing an additional dealer in a community *provided that the establishment of the new dealer is not a device by the manufacturer to coerce or intimidate an existing dealer.*

H.R.Rep. No. 2850, 84th Cong.2d Sess., 1956 U.S.C.C.A.N. 4596, 4603 (emphasis added); *see also Southern Rambler Sales,* 375 F.2d at 936; *Globe Motors, Inc. v. Studebaker–Packard Corp.,* 3rd Cir., 328 F.2d 645 (1964). Thus, in the absence of manufacturer coercion or bad faith, a dealer is relegated to its state franchise statute, if one exists, to challenge the establishment of a new dealership in a market area that it contends is adequately represented by existing dealers.[5]

All franchise regulatory statutes restrict intrabrand competition to some degree. Invariably, the regulatory legislation places restrictions on a manufacturer's efforts to establish an additional same-brand dealership in an automobile market already represented in the community by other dealers. *See Dave Zinn Toyota v. Dep't of Highway Safety and Motor Vehicles,* Fla.App., 432 So.2d 1320, 1322 (1983) ("the purpose of [the Florida auto franchise statute] is to prevent powerful manufacturers from taking unfair advantage of their dealers by overloading a market area with more dealers than can be justified by the legitimate interest of the manufacturer and its dealers, existing and prospective"). Such statutes, including the Delaware Act, generally require a showing of "good cause" before a dealership may be established or relocated, with certain statutory factors to be considered in determining

utes have withstood a series of constitutional challenges and have been upheld as a proper exercise of the state's police power. *Orrin W. Fox Co.,* 439 U.S. at 96, 99 S.Ct. at 405 (statute qualifies for "state action" exemption from federal antitrust regulations); *American Motor Sales Corp. v. Division of Motor Vehicles,* 4th Cir., 592 F.2d 219, *cert. denied,* 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979) (statute does not violate commerce or supremacy clauses).

whether such good cause exists. *See Annotation, Validity, Construction, and Application of State Statutes Regulating Dealings Between Automobile Manufacturers, Dealers and Franchisees*, 82 A.L.R.4th 624, 630 (1990). With some exceptions, the legislative factors in other jurisdictions parallel the factors enumerated in 6 *Del.C.* § 4915(c). *See, e.g., McDonald Ford Sales, Inc. v. Ford Motor Co.*, 165 Mich.App. 321, 418 N.W.2d 716, 717 (1987) (Michigan factors analogous); N.C.Gen.Stat. § 20–305(5)(b).

New Jersey has recognized that "the primary purpose of the restrictions on dealer competition countenanced by [its] Motor Vehicle Franchise Act is to protect existing dealerships from sustaining injury when a new dealer is inserted into its market area." *Monmouth Chrysler–Plymouth v. Chrysler Corp.*, N.J.Supr., 509 A.2d 161, 168 (1986). Nonetheless, the New Jersey court balanced the interests of existing dealers with the interests of the purchasing public to reach an appropriate standard for "injury" under its auto franchise act. *Id.* Similarly, the General Assembly of this State has attempted to strike a balance between the sometimes competing interests to protect existing dealers from unfair competition and the interests of the general public to promote healthy intrabrand competition which enhances consumer welfare. In declaring the purpose of the Act, the General Assembly made it clear that the regulation of vehicle franchises was necessary "to protect and preserve the investments and properties of the citizens of this State." 6 *Del.C.* § 4901.

■ Therefore, given the Act's history and its strong remedial purpose in protecting existing dealers, it would appear that an interpretation which would subordinate the existing dealer interest would be contrary to statutory intent. An agency charged with regulating franchises may not superimpose the interests of the general public over the interests of existing dealers. Rather, the regulatory agency is directed to effectuate the legislative policy by applying precise statutory standards where such standards exist. *See Atlantis I Condominium Ass'n v. Bryson*, Del.Supr., 403 A.2d 711, 713 (1979).

■ We recognize that the public welfare is the basis for all regulation under the state's police power. But the Act here under consideration was enacted to protect the interests of dealers from the coercive practices of automobile manufacturers. That special concern may not be subordinated in any balance of the factors which lead to a determination of "good cause." In short, the Commission must act in accordance with legislative policy when performing its regulatory function. *See Carroll v. Tarburton*, Del.Super., 209 A.2d 86, 88 (1965) ("an administrative agency may be given discretion as to implementation of legislative policy, but not as to determination of legislative policy.").

■ The context in which the interests of existing dealers normally arises is the commonly-found statutory factor which relates to the adequacy of dealership representation/competition in the pertinent market area. *See Annot., supra*, 82 A.L.R.4th at 658; 6 *Del.C.* § 4915(c)(5). Generally speaking, to successfully block a new dealership, the existing dealers must show that its creation will substantially injure the existing dealers' competitiveness. A mere increase in competition will not suffice since the Act is not intended to confer monopoly status to existing dealers.

■ The injury to existing dealers must be significantly more than just lost profits since each time that a new dealer is introduced into an existing dealer's market area, the existing dealer's sales and profits will be adversely affected. *Monmouth Chrysler-Plymouth*, 509 A.2d at 169; *Ricky Smith Pontiac v. Subaru of New England*, 14 Mass. App.Ct. 396, 440 N.E.2d 29, 47 (1982). Rather, the injury must be so severe as to cause substantial damage to the existing dealer's ability to offer adequate services. The New Jersey Supreme Court has held:

> [T]he antitrust law and our Motor Vehicle Franchise Act recognize the common goal of protecting dealer services through restrictions on intrabrand competition. Accordingly, an appropriate standard for measuring injury under the Act, both to a franchisee and to the public interest, is proof that the effect of a new dealership would be to reduce the profitability of the

protesting dealer to an extent sufficient to cause a substantial deterioration of that dealer's ability to provide adequate customer services. That standard of injury strikes a balance between evidence of inevitable termination due to business failure, a standard we find relevant but difficult to prove, and evidence merely of reduced profits.

*Monmouth Chrysler–Plymouth,* 509 A.2d at 168–69; *see also Benson & Gold Chevrolet v. Louisiana Motor Vehicle Commission,* La. Supr., 403 So.2d 13, 20 (1981) ("the legislative concern was the overloading of a market area when . . . the fresh competition might virtually destroy the older franchise. In this manner, the manufacturer could accomplish by indirection that which the law directly prohibits: the unfair termination of a dealer's franchise.").

■ It is not disputed that the Hearing Examiner, in determining whether Ford had established "good cause" for the establishment of the Union Park dealership, applied the § 4915(c) factors from a perspective which viewed the public interest/public welfare factor as predominant. Although, thereafter, he expressly considered the interests of competing dealers and the possible prejudice to their interests, he brought to that weighing process a distorted standard. In adopting these findings without modification, the Commission fell prey to the same fundamental error. It is no answer, as the Superior Court has implied, that as long as there is a factual determination that the proposed dealership will not intentionally or adversely affect the profitability of existing dealers, a theoretical distinction between the importance of statutory factors is irrelevant. A reviewing court must have confidence that not only are an administrative body's findings firmly supported by substantial evidence, but that the fact finder has applied the appropriate standards in reaching the ultimate determination. *Delmarva Power & Light Co. v. Public Ser. Comm'n,* Del.Supr., 508 A.2d 849 (1986); *see also Quaker Hill Place v. Saville,* Del.Super., 523 A.2d 947, 957–58, *aff'd,* 531 A.2d 201 (1987).

Because we cannot conclude with confidence that the Hearing Examiner's flawed weighing process did not affect the appropriate consideration to be accorded to the interests of competing dealers, we cannot view the erroneous application of the statutory factors to be of no consequence. Accordingly, we must remand this matter to the Commission for further proceedings. In that regard, if the Commission is satisfied that the evidence directed to the statutory factors is sufficient, it may perform the weighing process anew without according dominance to any of the six factors under § 4915(c). Since the error began at the Hearing Examiner's level, the Commission may, if it so chooses, refer the matter to the Hearing Examiner for appropriate correction.

### III

■ We next address the appellants' contention that Ford's proposal to establish an additional dealership was not "ripe" for resolution, with the result that the Commission's approval constituted an advisory opinion. Future Ford and Bayshore argue that the Commission's "good cause" determination under 6 *Del.C.* § 4915(a) must be made in response to an intention on the part of a manufacturer, based on firmly developed plans, to establish a new dealership at a specific location. In rejecting this argument, the Superior Court noted that the Act itself is lacking in the definitive indicia required to constitute "an intention to establish," and such generality has not been cured through adoption of administrative regulations or standards. Given the general language of section 4915(a), the Superior Court ruled that Ford had proved sufficient evidence of its intention to proceed.

As we view the evidence presented to the Hearing Examiner, Ford established that: (i) Ford's regional office had conducted marketing and population studies which supported the need for an additional dealership in the Wilmington Multiple Point; (ii) the establishment of an additional dealership would affect the competitive balance in the Wilmington Multiple Point but not adversely impair the profitability of other dealers; (iii) the Union Park location offered a suitable location; and (iv) the Ursomarsos had the experience and financial capability to operate a new fran-

chise. The Commission concluded that while the plans were not final, they were sufficiently definite to permit the Commission to visualize the proposed site and evaluate the proposed dealer.

Future Ford and Bayshore argue that the "ripeness" requirement for a good cause determination under the Act is analogous to that required in the granting of a declaratory judgment, *i.e.*, the controversy must have matured "to the point at which judicial action is appropriate." *Schick Inc. v. Amalgamated Clothing and Textile Workers Union,* Del. Ch., 533 A.2d 1235, 1238 (1987). In our view, that analogy is of limited assistance in administrative proceedings because the principal rationale underlying the ripeness concern in the judicial area, *i.e.*, limiting access to judicial resources, is not a pressing concern to an administrative body specifically charged with approving proposed dealerships. Here, Ford's plans had advanced to the point of evidencing a clear intention to proceed sufficient to activate the administrative process designed to test the appropriateness of the proposal under the factors set forth in § 4915(c).

We do have two concerns, however, with respect to the finality of the Ford proposal. As we view the record, Ford's plan for the new dealership, as presented to the Hearing Examiner, had not proceeded beyond the recommendation of its regional office. Although Ford contends that subsequently it executed a letter of intent covering the new dealership, this evidence is not part of the record before the administrative body. Upon remand, Ford should supplement the record to cure the deficiency. Secondly, there remains unsettled the exact location of the proposed dealership. The Ursomarsos operate three separate new car dealerships, as well as a used car dealership and support facilities in the vicinity of Pennsylvania Avenue and Union Streets. Before the Hearing Examiner, the Ursomarsos indicated that they planned to locate the new Ford dealership at the site now occupied by their Pontiac dealership, a move requiring the consent of

Pontiac. Although the Ursomarsos expressed confidence that such consent could be secured, no direct evidence on that point was presented. In the event Pontiac does not agree to being supplanted, another location in the general vicinity must be obtained. This uncertainty, which could affect the exact location of the new dealership, should also be resolved upon remand.[6]

Finally, we note that much of the dispute concerning ripeness stems from the indefiniteness of the statutory language that requires a manufacturer to "notify" the Commission "in writing ... of the intention to establish an additional dealer or to relocate an existing dealer within or into that market area." 6 *Del.C.* § 4915(a). To eliminate this uncertainty, the Commission should consider the adoption of a rule, under its rule making authority (26 *Del.C.* § 106), which specifies the information which must be filed with the Commission by the manufacturer as part of its notice of intention.

In sum, we conclude that the Hearing Examiner committed a fundamental error of law in according predominance to the public interest/public welfare factors under § 4915(c). This error served to distort the weighing process and requires reversal of the Superior Court and remand to the Commission for further proceedings. Incident to that remand, the Commission should require Ford to remedy the uncertainty in the record concerning (1) the indefiniteness of its intention to grant a franchise to the Ursomarsos and (2) the consent of Pontiac to the relocation of its dealership.

The decision of the Superior Court is REVERSED. This matter is REMANDED to the Superior Court with direction to FURTHER REMAND this matter to the Public Service Commission for further proceedings consistent with this opinion.

---

6. Although our remand is directed to the deficiencies of the plan for a proposed new dealership, any party is free to offer evidence in the reopened proceeding before the Commission touching upon that subject.