JOURNAL ENTRY AND OPINION
{¶ 1} Appellants Jay Park and Crestmont Cadillac Corporation (hereinafter jointly referred to as "Crestmont") appeal from the trial court's denial of their motion for a permanent injunction. Crestmont assigns the following errors for our review:
 {¶ 2} "I. The Trial Court Abused its Discretion and Erred as a Matter of Law by Denying Appellant's Motion for a Preliminary Injunction Order on the Basis of No Showing of Irreparable Harm."
 {¶ 3} "II. The Trial Court Erred and Abused its Discretion By Failing to Grant Injunctive Relief When Appellants Satisfied the Burden for Obtaining an Injunction."
 {¶ 4} Having reviewed the record and the legal arguments of Crestmont, we affirm the trial court's decision. The apposite facts follow.
 {¶ 5} On November 13, 2002, Crestmont filed its complaint against General Motors Corporation ("GM") and James Brown, with a request for temporary and preliminary injunctions. Crestmont claimed that GM violated its service agreement with Crestmont to give notice of any intended change in its Area of Primary Responsibility ("APR").
 {¶ 6} Crestmont's motion for a temporary restraining order was denied. A four-day hearing on Crestmont's motion for a preliminary injunction was thereafter conducted where the following evidence was presented.
 {¶ 7} Jay Park testified he had been the general manager of Crestmont, located on Chagrin Boulevard off of I-271, since 1991. In October 2001, he applied to GM to become the dealer operator of Crestmont through a GM Dealer Sales and Service Agreement. GM reviewed the application and effective December 7, 2001, GM approved Jay Park as the dealer and operator of Crestmont. Park paid $7 million for this arrangement. Crestmont has become the largest volume Cadillac dealer in Ohio. Furthermore in the Cleveland Area of Primary Responsibility set by GM, Crestmont is performing better than GM expected according to its own measuring guidelines.
 {¶ 8} In late 2001, James Brown, the owner of Classic Cadillac, applied to GM to relocate from Painesville to Willoughby, to a location where Brown currently operated a GMC Truck and Pontiac dealership. The Willoughby location was very visible from a freeway exit. Brown had taken over the Willoughby GMC/Pontiac location from a prior dealer who lost his dealer license due to a felony conviction. In order to get the location, Brown acquired the dealership by paying the prior dealer $3.2 million in up-front rental money and subsequently $40,000/month in rent. Brown testified his prior Classic Cadillac dealership was poorly located in Painesville and that the move to Willoughby would help him to pay the high-end rent.
 {¶ 9} GM preliminarily approved Brown's request, making the approval contingent on Brown building a stand-alone facility to house the Cadillac dealership. Brown subsequently built an $800,000 stand-alone showroom.
 {¶ 10} As early as January 2002, Park heard rumors from other dealers regarding the relocation of Classic. In February 2002, he wrote a letter to GM protesting that the relocation would harm Crestmont's sales. GM informed him they were aware of his concern but no final decisions had been made about the APR.
 {¶ 11} In September 2002, the Classic location was officially opened. The new location is approximately 13 air miles from Crestmont Cadillac and approximately 17 to 18 minutes in drive-time.
 {¶ 12} Thereafter, in October 2002, GM provided written notice to Crestmont and other Cleveland Cadillac Dealers that the relocation "may" result in a change in the dealerships' Area of Primary Responsibility. The assigned APR is merely a gauge used by GM to monitor the dealership sales activity and does not prevent the dealerships from selling outside the assigned APR. According to GM, this notice regarding the possible change in the competing Cadillac dealer's APR, satisfied Section 4.2 of the GM Dealer Sales and Service Agreement. Section 4.2, states in pertinent part:
 {¶ 13} "4.2 Area of Primary Responsibility
 {¶ 14} "Dealer is responsible for effectively selling, servicing and otherwise representing General Motors Products in the Area designated in a Notice of Area of Primary Responsibility. General Motors retains the right to revise Dealer's Area of Primary Responsibility at General Motors sole discretion consistent with dealer network planning objectives. IfGeneral Motors determines that marketing conditions warrant a change inDealer's Area of Responsibility, it will advise the dealer in writing ofthe proposed change, the reasons for it, and will consider anyinformation the Dealer submits. Dealer must submit such information inwriting within thirty days of receipt of notice of the proposed change.
If General Motors thereafter decides the change is warranted, it will issue a revised Notice of Area of Primary Responsibility." (Emphasis added.)
 {¶ 15} GM then asked for any concerns to be submitted. Parks responded to the letter within 30 days setting forth his concerns, claiming that the relocation of Classic Cadillac 13 miles away from Crestmont would affect the sales of Crestmont and that the notice of the proposed change in APR violated Section 4.2 of the agreement because GM should have sent the notice prior to the relocation. GM responded that the notice did not violate the agreement as it had not changed the APR and the notice was only required prior to the change in the dealers' APR.
 {¶ 16} GM's Zone Manager, Robert Griffith, and GM's contractual manager, Alison Zavadil, both testified that GM never gave notice of a proposed change in a dealer's APR due to a relocation until the relocation actually occurred. Prior to that, the relocation may fall through and the notice would be premature. Both also testified that Classic's relocation did not affect Crestmont's APR and that the APR of all the dealerships was changed in December 2002, due to the information received from the 2000 census.
 {¶ 17} At the hearing, Park stated the relocation of Classic Cadillac would decrease his sales by approximately 23%. The basis for his estimate was Robert Griffith's deposition testimony, in which he stated he anticipated Classic to sell approximately 15 to 25 cars more a month at its new location than its old location. At the time of the hearing, however, Griffith testified Classic was not meeting this expectation.
 {¶ 18} Park admitted since Classic moved to its new location, the sales at Crestmont have increased. He also admitted that a change in the APR does not prohibit him from selling cars in any area, but is simply a tool GM uses to gauge sales. Park also admitted the data collected from the 2000 census indicates Crestmont has the potential to take sales away from other luxury car lines.
 {¶ 19} Robert Griffith testified the proposed projection was that Classic would sell approximately 15 to 20 more cars a month at its new location. He did not believe Crestmont, however, would lose any sales to Classic. He attributed the projected increase in sales to the improved visibility and accessibility of Classic's new location versus its old location, which would attract some consumers to buy a Cadillac versus a different type of luxury car. He believed the new location would be beneficial to all the Cadillac dealers in the area because buyers usually shop various dealerships to compare prices. Therefore, one dealer could stimulate the interest and the other dealer could close the sale.
 {¶ 20} GM's expert, Sharif Farhat, testified he is employed at Urban Science Applications ("Urban") where he is the director of network analysis. Urban provides a service to aid clients to understand market share and deviations in the market. The automobile industry makes up the bulk of Urban's clientele. In conducting studies of market fluctuations in the automobile industry, Urban relies on actual vehicle registrations.
 {¶ 21} According to Farhat, Classic is located approximately 13.5 air miles from Crestmont. Farhat opined that the driving distance is always longer than air distance. Based on the 2000 census data, Farhat testified that there is stable housing growth in the Willoughby area with income potential for Cadillac. According to Farhat, Cadillac dealers have the opportunity to attempt to obtain sales from customers who usually buy Lincoln, Lexus, BMW, Audi, and Volvo automobiles.
 {¶ 22} Because of the tendency of consumers to cross-shop among dealerships, Farhat testified that the prime location of the new dealership could stimulate the interest in the product locally. Farhat then provided examples of other dealer relocations which stimulated the sales of existing dealerships.
 {¶ 23} Based on the above evidence, the trial court issued an order denying the injunction, stating:
 {¶ 24} "Motion for Temporary Restraining Order and Permanent Injunction is denied as proof of irreparable harm was not demonstrated by the evidence in regard to the change in the APR."[1]
 {¶ 25} We will address Crestmont's two assigned errors together as they both relate to whether the trial court erred in denying Crestmont's motion for a preliminary injunction. Crestmont maintains the trial court erred because Crestmont satisfied the requirements for obtaining a preliminary injunction.
 {¶ 26} The primary goal of preliminary injunctive relief is to preserve the status quo pending final determination of the matter.[2]
 {¶ 27} Injunctions are an extraordinary remedy, equitable in nature and their issuance may not be demanded as a matter of right.[3] The decision to allow or deny an injunction rests within the sound discretion of the trial court and depends on the facts and circumstances of the particular case.[4] The term "abuse of discretion" implies that the court's ruling was "unreasonable, arbitrary, or unconscionable."[5]
Therefore, to find an abuse of discretion, we must find that the trial court committed more than an error of judgment. When applying the abuse of discretion standard, a reviewing court is not free merely to substitute its judgment for that of the trial court.[6]
 {¶ 28} The movant has a substantial burden to meet in order to be entitled to a preliminary injunction.[7] The party seeking the preliminary injunction must establish a right to the preliminary injunction by showing clear and convincing evidence of each element of the claim.[8] In ruling on a motion for a preliminary injunction, the court must consider whether: (1) the movant has shown a substantial likelihood that he or she will prevail on the merits of the underlying substantive claim; (2) the moving party will suffer irreparable harm if the injunction is not granted; (3) issuance of the injunction will not harm third parties; and (4) the public interest would be served by issuing the preliminary injunction.[9] In reviewing the record, there is no compelling evidence that the trial court abused its discretion in denying Crestmont's motion for injunctive relief. We, in fact, conclude that Crestmont's preliminary injunction would not provide an equitable remedy.
 {¶ 29} At the time the motion was filed, Classic was already an operating business. In fact, as of the date of this appeal, it has been operating for over a year.[10] As stated above, the purpose of a preliminary injunction is to preserve the status quo. Crestmont seeks to reverse the status quo by obtaining a preliminary injunction requiring Classic to shut down its operation. Brown testified that he has invested over $3.2 million in the dealership, $50,000 in advertising the new location, owes $40,000/month in rent and would have to lay off fifteen employees if shut down. He estimated closing the Cadillac dealership while permitting his other dealerships to remain open would result in a minimum $150,000/month loss.
 {¶ 30} As this court in Ormond v. Solon held:
 {¶ 31} "The doctrine of laches may prevent injunctive relief where a party has delayed the commencement of an action. U.S. v. AmericanElectric Power Service Corp. (S.D. Ohio 2001), 137 F. Supp.2d 1060,1067-68. See, also, Holmberg v. Armbrecht (1946), 327 U.S. 392, 396,90 L.Ed. 743, 66 S.Ct. 582.
 {¶ 32} "Under Ohio law, a party invoking laches, to be successful, must show that the person for whose benefit the doctrine will operate has been materially prejudiced by the delay of the person asserting the claim. State ex rel. Caspar v. Dayton (1990), 53 Ohio St.3d 16, 20,558 N.E.2d 49; Freed v. Farag (1997), 994 F. Supp. 887, 891.
 {¶ 33} "In AK Steel Corp. v. Chamberlain (1997), 974 F. Supp. 1120,1126, the court provided the following overview of the doctrine of laches:
 {¶ 34} "Finally, the Court notes that the doctrine of laches would militate against granting an injunction here. Laches is an equitable defense which bars injunctive relief where a plaintiff unreasonably delays in commencing an action. Tri-Star Pictures, Inc. v. Leisure TimeProductions, B.V. (2d. Cir. 1994), 17 F.3d 38; Minnesota Public InterestResearch Group v. Butz (D. Minn. 1973), 358 F. Supp. 584, 619. The defense of laches `requires proof of (1)lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.' Kansas v. Colorado, 514 U.S. 673, 687,131 L.Ed.2d 759 at 774, 115 S.Ct. 1733 (1995) (citation omitted); see also Black's Law Dictionary 875 (6th ed. 1990) (`Doctrine of laches,' is based upon the maxim that equity aids the vigilant and not those who slumber on their rights. It is defined as neglect to assert a right or claim which, taken together with lapse of time and other circumstances causing prejudice to the adverse party, operates as bar in court of equity')."
 {¶ 35} The evidence at the hearing indicated that Crestmont was aware of the plans for the relocation of Classic as early as February 2002. Crestmont should not be permitted to delay seeking an injunction thereby increasing the harm Classic would suffer from such an injunction, when the degree of harm would have been less severe had Crestmont actively sought an injunction sooner. For the trial court to grant an injunction when Classic is already an operating business, in which Brown had invested millions of dollars, would be inequitable.
 {¶ 36} Even if the relief of injunction was timely sought, we agree with the trial court that Crestmont has failed to show that it would be irreparably harmed if the preliminary injunction is denied. Irreparable harm is one for which there is no plain, adequate, and complete remedy at law, and for which money damages would be impossible, difficult, or incomplete.[11]
 {¶ 37} Crestmont alleges it will suffer a 23% decrease in its sales. Park stated at the hearing he was basing this percentage on Griffith's deposition testimony that Classic would increase its sales by 15 to 25 cars. However, Griffith's testimony was only a projection, and at the time of the hearing, Classic was not performing any better than it did at its Painesville location. Furthermore, just because Classic is increasing its sales by 15 to 25 cars does not necessarily have the corollary effect that Crestmont's sales will diminish. As the evidence indicated, the prime location of Classic improved Classic's visibility and increased its potential to sell to consumers who might otherwise purchase another type of luxury car.
 {¶ 38} Finally, any loss in sales would result in monetary damages, which could be recouped from a successful trial on the merits. Such damages are inappropriate to support injunctive relief.[12]
 {¶ 39} Although Crestmont also contends it will suffer damage to its goodwill, testimony by GM's Zone Manager, Griffith, and GM's expert, Sharif Farhat, indicated that Classic would boost Crestmont's business based on the fact it would increase the visibility of the Cadillac product. The 2000 census data also indicated that Crestmont had the opportunity to increase its sales by attracting consumers who normally would purchase other types of luxury vehicles. Crestmont presented absolutely no evidence that its goodwill would be damaged.
 {¶ 40} Crestmont relies on Beilowitz v. General Motors Corp.[13]
to support its argument that it will suffer irreparable damages to goodwill. However, in Beilowitz, the distributor of automobile parts would be prohibited from selling in certain areas, which would cut its sales territory by 40%. In the instant case, Crestmont's area is not being limited or downsized. It is free to sell outside the APR and there is no evidence its APR was decreased due to the relocation. The testimony indicated that Crestmont has a beautiful facility and an outstanding reputation as a dealership. There is no evidence that its established client base would be damaged by Classic's relocation.[14] Although we understand goodwill is hard to quantify, there has to be some basis alleged for how it will be damaged.
 {¶ 41} Simply creating competition between the dealers cannot constitute grounds for establishing damage to goodwill as this would disrupt healthy competition between dealers. As the court in Hal ArtzLincoln-Mercury, Inc. v. Ford Motor Co.[15] stated, such competition is beneficial to the public:
 {¶ 42} "Indeed, courts and agencies administering these statutes [franchise statutes] around the country have affirmatively recognized that, in addition to the manifest benefit to the public interest from decreasing consumer prices on automobiles, such competition benefits the public interest by having positive influences on sales and services.McDonald Ford Sales, Inc. v. Ford Motor Co. (1986), 165 Mich. App. 321,418 N.W.2d 716, 718 (increased interbrand competition affords the consuming public additional opportunities to comparison shop and assures better prices and higher quality services); General Motors Corp. v.O'Daniel Oldsmobile, Inc. (1989), 232 Neb. 11, 439 N.W.2d 453, 458
(`Generally speaking, when competition is increased, lower prices and better service are a result of this increased competition'); Benson andGold Chevrolet, Inc. v. Louisiana Motor Vehicle Comm. (La. 1981),403 So.2d 13, 21-22 (public interest not served by keeping every dealer secure from financial loss occasioned by fair competition). Cf.McLaughlin Ford, Inc. v. Ford Motor Co. (1984), 192 Conn. 558,473 A.2d 1185, 1192 (injury to dealer from increased interbrand competition traditionally considered `insignificant' compared to benefit to consumers)."
 {¶ 43} Therefore, although Crestmont fears that it will suffer damages that it will be unable to recoup from a trial on the merits, it failed to present clear and convincing evidence to support this. Given the extraordinary remedy a preliminary injunction provides, we fail to find the trial court abused its discretion by denying Crestmont's motion.[16]
 {¶ 44} Crestmont's two assigned errors are overruled.
 {¶ 45} The judgment is affirmed.
Judgment affirmed.
Colleen Conway Cooney and Timothy E. McMonagle, JJ., concur.
[1] May 6, 2003, Journal Entry.
[2] Ohio Urology Inc. v. Poll (1991), 72 Ohio App.3d 446, 452-453;Yudin v. Knight Indus. Corp. (1996), 109 Ohio App.3d 437, 439; Cardinalev. Ottawa Regional Planning Comm. (1993), 89 Ohio App.3d 747.
[3] Perkins v. Village of Quaker City (1956), 165 Ohio St. 120, syllabus.
[4] Danis v. Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.
(1995), 73 Ohio St.3d 590, 604, citing Garano v. State (1988),37 Ohio St.3d 171, 173.
[5] State v. Adams (1980), 62 Ohio St.2d 151, 157.
[6] In re Jane Doe 1 (1991), 57 Ohio St.3d 135, citing Berk v.Matthews (1990) 53 Ohio St.3d 161.
[7] Sinoff, M.D. v. Ohio Permanente Med. Group, Inc.,146 Ohio App.3d 732, 741, 2001-Ohio-4186; Ormond v. Solon (Oct. 18, 2001), Cuyahoga App. No. 79223.
[8] Vanguard Transp. Sys., Inc. v. Edwards Transfer Storage Co.,Gen. Commodities Div. (1996), 109 Ohio App.3d 786, citing to Mead Corp.,Diconix, Inc., Successor v. Lane (1988), 54 Ohio App.3d 59.
[9] Sinoff v. Ohio Permanente Med. Group, Inc., 2001-Ohio-4186, at ¶ 40.
[10] The underlying case is set for trial on March 22, 2004.
[11] Cleveland v. Cleveland Elec. Illum. Co. (1996), 115 Ohio App.3d 1,14.
[12] Cleveland v. Cleveland Elec. Illum. Co.,115 Ohio App.3d at 14.
[13] (D.N.J. 2002), 233 F. Supp.2d 631.
[14] [EDITORS' NOTE: FOOTNOTE 7 IS OMITTED FROM THE OFFICIAL COPY OF DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[15] (Sept. 24, 1992), 10th Dist. No. 91AP-1493.
[16] We note that although Crestmont spends a good portion of its appellate brief discussing the legislature's enactment of R.C. 4517.50
which allows a dealer to protest the relocation of another within 10 miles, the evidence clearly shows that Crestmont is more than 10 miles away from the relocated Classic. Therefore, any argument pursuant to this statute is irrelevant to a determination of the appeal.